### IN THE

# HIGH COURT OF ERRORS AND APPEALS

### FOR THE

# STATE OF MISSISSIPPI.

## FEBRUARY TERM, 1860.

### JESSE J. KELLY ET AL. *v.* SAMUEL R. MILLER.

39 17
77 619

1. VERDICT OF A JURY: EFFECT OF.—It is a well-settled principle that the verdict of a jury will not be disturbed unless it is manifest from the whole record that it was clearly wrong, or unless misdirection of the court, or other error apparent on the face of the record, may have tended to produce such a verdict.

2. JURY: PRESENCE OF. VERDICT: EFFECT OF.—It is the peculiar province of a jury, where the evidence is conflicting, to weigh the testimony, and give credit to those facts and circumstances which in their judgment are entitled to the greatest consideration, and it is not for courts in such cases to rejudge their judgment.

3. COURT: DECISION OF, IN LIEU OF A JURY.—If an issue of fact by agreement is submitted to a probate judge "in lieu of a jury," the decision of the judge will have the force and effect of the verdict of a jury.

4. EVIDENCE: WITNESS: INTEREST OF.—The executor of a will, who is also the principal legatee and devisee under the will, is a competent witness to sustain the will. Rev. Code, § 17, page 510.

5. WILL: INSANITY.—In an issue involving the capacity of a testator to make a will, in which many witnesses testified to great eccentricity and belief in witchcraft of the testator, and gave their opinion there was not capacity to make a will, and other witnesses testified that the testator understood the value of property, and had capacity to make a will, the testimony being conflicting, a court will not disturb the verdict of a jury upon the issue.

APPEAL from the Probate Court of Yalobusha county. Hon. R. D. McLean, special judge.

VOL. X.—2

On the 16th day of June, 1858, Jesse J. Kelly and others, brothers and children of the deceased, brothers and sisters of Joseph P. Kelly, deceased, filed their petition in the Probate Court of Yalobusha county, against Samuel R. Miller.

The bill, after setting out the relationship of the complainants or petitioners to Joseph P. Kelly, in substance charged that an instrument of writing, purporting to be the last will and testament of Joseph P. Kelly, deceased, had been, at the February term, 1858, of the Probate Court of Yalobusha county, probated at the instance of Samuel R. Miller, who was named as executor in said pretended will. It was charged that said will was not the last will and testament of said Kelly, because—

1st. It was procured to be executed by undue influence.

2d. That said Kelly was not at the time of signing, making, publishing, and perfecting the said will, of sound mind and disposing memory.

3d. That the subscribing witnesses thereto did not attest the same according to statute.

4th. That the subscribing witnesses did not attest and witness the same at the instance and request of Kelly, but at the request of another person.

5th. That Joseph P. Kelly did not publish the same as his last will and testament.

6th. That Joseph P. Kelly was procured to execute the said will by fraud, deceit, and undue influence of Samuel R. Miller.

The petition prayed for a jury to contest the will in the manner prescribed by statute. An answer was filed denying the petition, and admitting the right to a jury to try the issue, &c.

After several ineffectual efforts to obtain a jury, a motion was made by the petitioners' counsel to direct the coroner of the county to summons a jury, in consequence of partiality and interest in the sheriff, who was a subscribing witness to the will, which motion was sustained. It was finally agreed between counsel of the parties litigant that "the issue should be tried by the court in lieu of a jury, the unsuccessful party to have the right of appeal as though a jury had decided the issue." The court, after fully hearing the testimony, ordered, adjudged,

and decreed that the will should be sustained, from which an appeal was taken by the petitioners.

The evidence is very voluminous, but the material features of it will be found in the following abstract.

Samuel R. Miller was first introduced by the propounders of the will, and his testimony was objected to by the petitioners, because he was the executor of the will and principal legatee and devisee under the will, and was incompetent on the ground of interest. The objection to his testimony was overruled, and he was permitted to testify, and a bill of exceptions was taken to the ruling of the court.

*Miller's evidence.*—Was present when the will was executed; is executor, legatee, and devisee under the will. Testator died in the month of February, 1858. The first intimation ever given witness by testator that he intended to give him his property was two or three years before his death; witness was at his house in the night, visiting as a physician some sick young negroes; Kelly said they were of much trouble, and would never be of much service to him, but would be of advantage to some person, and likely to witness as any person. Witness made no reply,—really did not know what he meant. The subject was again mentioned; was about a year afterwards when Kelly told witness that his boy Bill was so devilish he could not manage him, and that he (Kelly) must sell him, and asked witness if he would not purchase, when witness told him he was not able. About a month afterwards, when witness was at Kelly's house, he again told him that he could not manage Bill, and his influence was bad, and insisted on witness buying him. Witness asked him what he would take. Kelly said $900. No trade was made, but a few days afterwards Kelly sent Bill to witness. In a few days after, witness was at Kelly's to see a patient; Kelly asked witness how he liked Bill. Witness said "well." Kelly said witness had not given any thing like the value; that Bridgus and others had offered him much more, but the price was not what he was after; that he intended witness should have them all; that the negroes were family

negroes, and he did not intend they should be separated.    This was all that took place until the fall before testator died.    Kelly also said he could not manage his business; that he wanted Miller to do it, which he declined on account of his own business, but offered to attend to any outside business; and witness suggested that he should give the management of his business to some of his *kin.*    Kelly said no, he had tried them, and they always left him in a worse condition than they found him; that they never should have any thing he had, or any thing to do with it.    Nothing was then said about a will.

A few days before Kelly died he sent for witness; when witness arrived Kelly told him it was not so much medicine he needed, but he wanted to arrange his business; that he wanted to give witness his property; that he did not want his negroes scattered, and his relatives would scatter them.    Witness suggested to Kelly that he had a brother who was able to take them, and pay the other relatives their proportion.    Kelly said he was opposed to his brother having the negroes; that he was a hard master and a dissipated man.    Kelly insisted on witness taking them, and said he knew witness would carry out his wishes,—that he had confidence in him.

Witness asked Kelly HIS TERMS.    Kelly said witness could afford to take his property, and pay his relatives $5,000, in annual instalments of $1,000.    He afterwards spoke of having the thing fixed up, and Kelly asked witness to write his will. Witness said he did not know how.    Kelly said he would do it himself, but was too unwell to sit up.    Kelly asked witness to get some person to do it, and he would pay for it.    Witness then went to Judge Martin and asked him to write the will. Martin went out, saw Kelly, and got instructions how to write the will.    This was four or five days before his death.    Witness was in the room during the conversation between Martin and Kelly, but cannot tell all that passed between them, but remembers they were in conversation about the will, about his relatives, and other topics.    Thinks he heard the amount that Kelly's relatives were to receive, to wit, $5,000.    Martin returned from Kelly's and prepared the will in a day or two. Witness went out and carried the will.    Kelly said he had

thought of the matter, and had concluded that by putting the time longer, that he (Miller) could pay more—$7,000 in ten years. Kelly said he did not want to encumber witness, and wanted him to make something by it.

Witness had another will prepared, making the alterations as suggested by Kelly. The paper in court was the second will. Kelly started to read the will, but the room was dark, and he asked Murray to read it, who did it.

Kelly had told witness to bring Murray, who was sheriff, to witness the will, as he was a man of standing, and there ought to be a man of importance. Witness carried the will out, and took Murray, as suggested by Kelly, and witness sent after Adams and Williams, the other subscribing witnesses. The will was executed, and Kelly was at himself, and acted like other men. Witness saw no evidence of derangement then, *or at any time when the will was talked about.* The will was Kelly's own voluntary suggestion, and no influence that witness knows of was ever brought to bear upon him.

Kelly had known witness nine or ten years, during which time witness was Kelly's family physician; he lived two and a half miles from him, and was rarely at his house except professionally. The inventory of the estate is a fair valuation. Bill was inventoried or appraised by commissioners. Witness did not interfere, thinking it made no difference. Kelly had told witness it made no difference as to the purchase-money of boy Bill; that he would not need it unless he bought land, which he would have to do if he kept the negroes.

Witness said the will was made by Joseph Kelly freely and voluntarily, and in the absence of all undue influence or fraud, so far as he knew or believed.

*Cross-examination.*—Witness did not know exactly when he bought Bill, but it was a short time before Kelly died. Has no bill of sale; no one witnessed the trade. Bill was worth when witness bought him $1,200, and he would not have bought him but for the fact he was a bargain. No person ever heard any conversation between witness and Kelly unless Judge Martin did. Witness went to Martin to get him to go

out and get instructions from Kelly as to writing the will. Kelly first suggested the condition in the will. Witness does not know that he ever heard Kelly talk unnaturally. Witness asked Kelly the conditions on which he would give him the property, and Kelly told him.

Witness said that he had the rumor from more than one source before he bought Bill, and before the will was talked about, that Kelly was insane about witches.

When witness first became acquainted with Kelly something was said about witches, and witness tried to draw Kelly out on the subject, but Kelly said there was no use to say any thing further upon the subject, and it was never referred to again.

Kelly had an ulcer on his penis, and a difficulty in urinating, and was otherwise diseased, and witness treated him with calomel, opium and preparations of iron.

Kelly was sick about six weeks. A portion of the time witness had *hopes* of his recovery, but seven or eight days before his death his lungs became involved, and witness gave him out. Dr. Gorie was sent for, the night he died, not many hours before he died; his pulse was low. Witness frequently asked Kelly to have another doctor, but he declined, and he took Gorie without Kelly's consent.

It was about a week between the times the two wills were carried out. When the first will was carried out, witness carried Fox, Murray, and Shannon with him. Whether or not they were invited in the house, witness does not recollect. Murray was carried at Kelly's suggestion. Does not remember that Kelly gave him any instructions as to Fox and Shannon. Witness does not remember that any person was present when first will was presented, and heard the conversation about the change in the will. Witness does not remember whether Kelly was in bed when the will probated was presented to him. Murray, Fox, and Shannon, who had gone out to witness the will, remained at the gate, a short distance from the house, and witness went in and conversed with Kelly in reference to the will. He was at the house of Kelly but once between the times he carried out the two wills. When the will was executed, H. H. Brigers was present in addition to the subscribing witnesses.

In a majority of cases the mind would be affected no more by diseases of the genital organs than by any other disease. He does not remember that he ever talked to any of the subscribing witnesses as to Kelly's capacity to make a will before it was made. Witness might have told Fox that it was generally understood that Kelly was insane, and he thinks he told him that Kelly had offered to give him his property, but he tried to persuade him to give it to his brothers. Witness thinks he talked to Adams about Kelly's partiality, but he did not charge his memory, never expecting any difficulty about it.

When Murray read the will, Kelly said the clause about the indifference of his brothers might as well have been left out. Witness told him to strike it out. Kelly said, No, it is true, but might as well have been left out, but it was not necessary now to strike it out.

After the will was executed witness offered the party cigars, but Kelly declined, saying he preferred his pipe, and talked about the different kinds of tobacco, and raising of it.

Witness does not recollect calling Kelly "Uncle Joe;" it was not the habit of witness. Witness thinks that the conversation about "raising" (erasing?) the part of the will objected to was in the presence of the subscribing witnesses.

The will is in the handwriting of E. C. Walthall, Esq. Witness gave the will to John H. Murray, Kelly having given it to witness because he had no safe place to keep it.

Witness was about moving to Memphis when Kelly proposed to give him his property, and for this reason, and because he thought it would be more natural for his brothers to have it, and because he did not know his terms, that he recommended Kelly to give his property to his relatives.

Kelly's brother, that witness alluded to as being able to pay his other brothers, lived in Arkansas.

The will and its probate was then read. The will directed the executor, Samuel R. Miller, to pay the sum of seven hundred dollars annually, for ten years, to the testator's brothers and sisters, and to their children, if dead, such share as their parents would have received. The following is the third item

or clause of the will, frequently referred to by the witnesses examined in the cause :

"*Third.* Doctor Samuel Miller, of Coffeeville, Mississippi, having been my tried and trusted friend for the last ten years, during which time he has been my physician, and as continued separation from my relatives for a long period of time, together with the indifference towards me which has characterized their conduct during that time, inclines me to make no provision for them other than has been already done in this instrument, I do hereby devise, give, and bequeath to said Samuel Miller and his heirs forever, all the property, real and personal, of which I may die the owner, and all interest of every character which I may have at my death, charged only with the annuities hereinbefore mentioned."

By another clause of the will Miller was appointed executor, and no security required of him.

The subscribing witnesses to the will are John H. Murray, W. B. Adams, and S. L. Williams.

The original will was sent up with the records, and the following facts appear in relation to the signing : at the close of the will, at the ordinary place of signing, the word "seal" with a scroll around it is written in the handwriting of the will. Opposite this seal is written "Joseph P.," which is erased as though the finger had been drawn over it before it was dry. On the third line below this is written the name of Joseph Kelly, and "seal" with a scroll around it opposite the name.

G. Q. MARTIN was then examined, who stated that Miller applied to him to go to Kelly's to write his will. He went out in a few days, and found Kelly in his bed. After sitting some time, and conversing about ordinary topics, Dr. Miller remarked that witness could draw up the will that he (Kelly) had been talking about. The subject of the will was then introduced, and Kelly gave witness the name of his brothers and sisters, and named others who had died without heirs, and witness told him it was not material as to them. Witness stayed at Kelly's three-quarters of an hour. They talked about crops, cotton, &c.;

Kelly stated the amount of cotton crop the year previous, a fact that witness did not know.

Kelly said he would give his relatives five thousand dollars in five annual instalments; that Miller could make it by the use of the property; that it would be a "good *lay*" for him. Said he had thought " he would not give his relatives any thing, but when one comes to die one's mind changes." Something was said about Dr. Johnson; Kelly said, as Dr. Johnson said, &c.—quotation forgotten. He said in that conversation that but " for some breaks in his (Johnson's) character he would have been a great or good man." Spoke of his property being worth some $15,000 ; that he could get that for it, but money was not his object. That he had not made as much out of his property as he could have made. The will was written by E. C. Walthall for witness, in accordance with Kelly's directions. Witness said Kelly knew what he was talking about as well as witness. Kelly mentioned Jefferson's name.

When Kelly mentioned his brothers and sisters, he then said, " But that unfortunate affair,—but you don't believe in any thing of the sort." Witness did not understand the remark, and with this exception Kelly talked and acted just as witness would expect anybody else. The will was in accordance with Kelly's instructions, which were given without any assistance from any one. The present will corresponds in all respects with the first, except the amount to be paid to his relatives is changed from $5,000 to $7,000, and ten years are given to pay it, instead of five years. Witness thought Kelly was of sound mind when he gave his instructions for the will.

Dr. Miller first spoke to witness as a friend to know if he should accept the property. Miller talked with him about Kelly's notions about witches, and said of late he had not talked so much of those things. It was the first time witness was ever in Kelly's company. Witness went to Kelly's with Dr. Miller, and regarded himself as Miller's counsel.

JOHN H. MURRAY.—The will in court was executed at Kelly's house. Miller told witness that he wanted him to go to Kelly's to witness his will. He went, and soon Adams and

Williams and Bridgers came. All went in Kelly's room, where Kelly was on the bed. Miller then told Kelly the parties were there to witness that will. Witness read the will to Kelly. When the will was being read, Kelly said there was a clause in it he had rather was not there, and when told it could be stricken out, he said it did not matter. Kelly wrote his name, —started to write it, and finding there was not room, rubbed it out, and wrote it again, leaving the P. out of his name last written. Witness and the other witnesses signed the will in the presence of the testator and of each other.

Kelly acted as much in his mind as most people, and witness never found him otherwise. Was as much so when he signed the will as usual.

Witness had had dealings with Kelly for five or six years; had claims against him, and visited him on that kind of business. He acted as other men in settlement, and generally gave orders on Bellamy. Witness always thought Kelly a man of good mind.

Kelly first attempted to read the will, and then witness read it at his request.

*Cross-examined.*—Witness does not remember that Kelly asked him to witness the will. Dr. Miller asked him to witness the will. Heard Kelly in his lifetime talk about witches. Seven or eight years ago his gun was so bewitched he could not kill a squirrel. Three or four years ago he said Mrs. Elsey had bewitched his spring, and these were the only instances when any such conversation occurred.

Never heard Kelly say any thing about his lost brother or sister.

Does not know who wrote the second "seal" to the will, and does not know the handwriting. Does not know how long it was before Miller handed him the will. Thinks Miller called Kelly "Uncle Joe." Witness had seen but little of Kelly since he has been sheriff. He saw him principally when he (witness) was constable; was elected constable in 1848.

W. B. ADAMS.—Was sent for to witness the will; does not

know who sent for him. Some time after he arrived at Kelly's, he went in his room and found Kelly in the bed. Murray read. the will in Kelly's hearing; he thinks at Kelly's request. Kelly remarked that there was a part of the will about the absence of his relatives that had as well have been left out. Miller told him that part should be stricken out, and witness does not remember that Kelly said any thing before he signed it. Witness, Murray and Williams signed the will, he thinks, at the request of Dr. Miller. The witnesses and testator signed it in the presence of each other. Witness stayed two or three hours.

Witness thought Kelly of sound mind, except his witch notions, and he said nothing about witches at that time; talked upon other subjects. Had known him eight or nine years. Talked on other matters like a man.

Heard Kelly talk of witches and conjurers, but not very frequently. He once said they would not let him go to his low grounds, or his smoke-house. Once said the conjurers pushed him off from a log into the creek; this was two or three years before he died. Once heard him say his horses would not plow on account of the conjurers. Never heard Kelly mention a lost brother or sister.

Does not know who wrote the word " seal " last written opposite where Kelly signed, or the handwriting. Miller told Kelly there was not room to write where he first began, opposite first seal made.

Witness thinks Bridgers and Chapman were in the room when the will was signed. Thinks Kelly was sixty-five or seventy years old.

Witness lived within a mile of Kelly. Bridgers got witness' affidavit from court, and came with it to him. (This alludes to affidavit made to probate will.) He asked him if he made it. I told him at the time I made the oath I made the exception as to the witches. The affidavit was explained to me out of court, and I went into court and made it. I told Bridgers that at the time Kelly signed the will he knew what he was doing. I was not entirely satisfied with the affidavit.

Thinks Kelly understood what he was doing. The explanation given by Martin was, if he (witness) believed that Kelly

was at himself, and knew what he was doing, then his belief in witchcraft had nothing to do with it. I heard Kelly say in 1854 that he did not intend his brothers should have his property; that they treated him with indifference, and were bad masters, and only came about him in passing.

—— WILLIAMS.—Was not at Kelly's when they arrived there with the will. When he arrived Murray was reading the will. He is a subscribing witness. Heard no conversation about the will; they were half done reading it when he arrived. Kelly knew what he was doing. Had known him since 1848,—lived in three-quarters of a mile, and saw him often, but never after the will was executed. He (Kelly) appeared to know what he was doing as I ever saw him. Thinks Kelly made some objection to the will, but afterwards said it made no difference. Witness would not say Kelly's mind was sound on all subjects, but thinks Kelly knew what he was doing at that time. Kelly made no other remark until the will was signed. Witness heard him say but very little besides this on any subject. Dr. Miller helped Kelly out of the bed. Dr. Miller asked me to subscribe as a witness to the will. Very little talking was done during the time of executing the will.

Witness has often heard Kelly speak about witches and conjurers. Kelly said the conjurers would not let him go to his bottom-land. Witness did not pay much attention to the "witch talk." Kelly told witness the conjurers would not let him go to his horse-lot. Kelly sometimes attended to his farm, and when he could not go into his bottom-fields the negroes managed it as they pleased.

Do not know who sent after me to witness the will; I was not at the house when the messenger came. At the time of taking the oath I made exception about Kelly's being of sound mind on the subject of conjuration. Judge Martin told me we could explain this in court,—suppose Martin referred to the time it would come to trial. Did not make any explanation when I took the oath in court. I was not entirely satisfied with the affidavit, and I am not now satisfied with it. I would not now make it. Would be satisfied with the addition that

Kelly believed in conjuration and witchcraft. Thinks Kelly understood what he was doing when he made the will. Dr. Miller helped Kelly out of the bed, and asked witness to sign the will. Witness saw Kelly a few days before he signed the will, and heard him say the conjurers would not let him go in his bottom-lands. Witness once told him (Kelly) that he did not believe in such things, and afterwards when he would commence talking on that subject, he (Kelly) would stop and say, "but you do not believe such things." Witness heard Kelly say something about his "lost brother," but does not remember what he said. Did not see any person write "seal" opposite Kelly's name, and does not know who done it.

He gave the description as to the way the name was written as other witnesses.

On the day Kelly executed the will he was very feeble, and did not talk much. After the will was signed Miller offered the company cigars. The kind of tobacco the cigars were made of was discussed, and Kelly said something about raising tobacco. Kelly did not talk much, and this is all that witness remembers was said.

Thinks there was but one seal on the will when it was signed, and that the other now there was not there.

JOHN HALL.—Knew Kelly seven or eight years; cropped with him one year. Kelly had but little to do with it. Sometimes witness consulted him, and Kelly talked as sane as any man on the subject of farming. Was there ten months and had various dealings. Kelly employed him and settled with him. Kelly talked as other men, but occasionally got off on the subject of witches. After witness told him he did not believe in them, he did not talk much to him about it.

Witness went to see Kelly after he was sick, and Kelly talked rationally. Witness and Kelly differed in settlement, and Adams decided it.

When witness went to live with Kelly, he had but fifty or sixty bushels of corn. Witness lived in the house with Kelly. Kelly had eight or nine hands. Kelly told witness he had not seen inside of his crib for four years; that he was conjured so

he could not do it.   He could not go to his low grounds, and his horses were conjured so they would not plow.

Witness heard Kelly speak of a lost brother once, and asked him what had become of him, and Kelly said, "Ah, God knows !"

Kelly said when his mother was confined, the midwife had stolen his brother and put a girl in his place.   Heard Kelly speak of Nancy Miltins, or some other woman, being buried, and something being placed in the coffin in her stead.   Witness has known Kelly when talking to break off suddenly about witchcraft.   He did the year witness lived there go to his bottom-field and barn.

Whatever accident happened to . Kelly he attributed to the " conjuring bitch of a devil."   Kelly told witness that he had not had a good night's rest for forty years, but witness thought he slept well enough while he was there.   Kelly had trouble with his gun, which he said was bewitched.

Kelly had gravel.   In his last illness, when witness went to see him, and asked him how he got along, he said, " Well enough, if that old bitch would let my water down."   Witness thinks Kelly was tight in a trade, but he might have been overreached.

Kelly mostly attributed every thing that went wrong to witches.   Kelly would often burst into tears without any apparent cause.   He had none of the usual comforts of living ; he had one feather bed, but not enough of bed-clothing to keep him warm.   Kelly said he could make better crops if it were not for the " old bitch."

Kelly had Mr. Carragee to attend to all his business except his farm.

Thinks there is something wrong in a man that talks as Kelly did ; there must be a screw loose somewhere.   Kelly went about with his hat drawn over his face.   Some days he would take his conjuring notions, and have them two or three times a day.

IsAAC HOBART.—Knew Kelly well,—intimate with him the latter part of his life.

Kelly talked sensibly when speaking of big men, history, politics, Scripture, Webster, Van Buren, &c. Kelly talked sometimes in a way I would not call sensible, but when I could call him off from this once, and get him on the subject of history and politics, he was sensible enough. Kelly sometimes talked upon the subject of conjuration, but when not on this subject he was sensible.

Sometimes when he had his conjuring ways on him any one might have cheated him.

Kelly was a good farmer; sharp on a contract.

Witness went to see Kelly five or six weeks before he died; did not talk of conjurers; spoke of a disposition of his property,—wanted to keep his negroes together. Said he would set them free if he could; that he would not distribute them with his relatives.

Saw Kelly on Saturday before he died; then talked sensible. For six months before he died he talked less of witches, and the two last occasions witness saw him he did not talk of them at all.

Heard Kelly talk of his lost brother; said he was stolen and a girl placed in his place. When we were fishing, and Kelly would get into a deep study, he would commence talking of witches. Kelly said he did not fish much; that the witches would not let him. Witness endeavored and always did change the subject.

Kelly was a fine historian; had read the history of the United States and the history of the world. Could tell about King Richard; how they used to do in their tournaments. Richard III. and Richard IV., big men and ruled over the people.

I believe he said Richard III. rode in a tournament. Said Richard was an old assassin, and been the means of Queen Elizabeth's death. He could tell all about this.

I think Kelly had fully half dozen books,—some novels, some histories. Had a Bible; did not believe it. Said it contradicted itself about the river Euphrates; said it run so and so, and it was not nigh that place.

When asked who Kelly said took Babylon, witness said he

did not know exactly; that he was not certain whether he said it was Richard or not.

Witness said upon the subject of his reading, that he had read a part of the history of the world, but it was burned· up in his house, and he did not complete it. Witness did not know whether Kelly was correct or not in what he said about history. He could tell all about Revolution battles.

Kelly never did get through telling witness about the girl child put in place of his brother. He said he believed he would go and hunt his brother. Kelly made a good crop; worked oxen,—worked eight or ten hands, and made twenty-one bales of cotton.

Kelly said the witches threw him in the creek when fishing; said his gun was conjured.

Kelly loved a dram; saw him tight once. When tight he would not talk at all upon the subject of witches.

Kelly was a good man, kind neighbor, and never talked foolish about business.

THOMAS BRANDON.—Knew Kelly many years. He could make a contract; understood the value of property; talked sensibly in business matters; had a good recollection. Saw Kelly Sunday week before he died, and he appeared in his usual state of mind. Talked sensibly enough part of the time, but witness stayed only a few moments. Kelly sometimes mixed his witch-talk with his business matters a little. Heard Kelly talk about witches about as the other witnesses had done. When among strangers he never talked of witches; thought they did not believe him. Never talked foolish of business.

Heard Kelly say that he thought he had seen his lost brother in a machine shop in Richmond.

Heard Kelly say he went to Georgia in search of a young man named Tabb. Kelly said Tabb's relatives accused him of killing him, but he left him in Georgia, and he went there to find him. Heard Kelly speak of Tabb every year as long as he knew him.

Kelly attributed things that went wrong to witches,—sickness

of negroes and bad stands of cotton. They prevented him from going to his field, crib, &c.

Kelly told witness that Nancy Williams was once at the spring with the conjurers, and he tried to kill one of them with a "battling stick."

Witness heard Kelly speak of being lead out of a house backwards by the conjurers. Heard Kelly speak of a woman's being hung in his father's barn.

Witness saw the letters written that are shown in court. He was a month in composing one of them. Saw Kelly when his application for a land-warrant was being made out for his services in the war of 1812 : he gave such facts and dates as enabled him to get the warrant.

M. J. HARBOUR.—Witness became acquainted with Kelly in 1843, and knew him well in 1847, until his death. Ginned Kelly's cotton in 1847 ; sold him corn in 1850.

Witness was never in Kelly's company long enough to hear him talk about witches.

Kelly appeared to have good memory. He was with his wagon hauling cotton. Talked rationally upon stock, crops and business, and was good in figures "as most of the boys." Never heard him talk otherwise than sensible.

Witness was young in 1847,—going to school. Kelly generally walked with his hat down over his eyes, and would not look at the person with whom he was conversing.

WM. JOHNSON.—Knew Kelly since 1855. Ginned Kelly's crop in 1856. Never saw any thing wrong about Kelly. Contracted with him to gin his cotton, and settled with him.

T. E. ATKINSON.—Knew Kelly in 1850, till his death. Most business he had with him was as constable. Kelly seemed to know how to do business. Thought Kelly a man of good mind. Never saw any thing wrong but once, and then he talked foolishly about a horse he had bought. He said he "was bedeviled and bewitched," &c. Once tried to buy Kelly's land; Kelly

declined selling; said he was too old to break up, &c., and talked rationally. Saw Kelly last two years since.

H. T. GARNETT.—Met Kelly twice in 1854. Kelly spoke to him about his land being condemned by railroad, and that injustice was done him, &c. Saw nothing irrational.

DANL. YENG.—Knew Kelly from 1844 to two years before he died. Visited his father's mill, which he kept. Kelly was there, and talked and acted rationally. Thought him capable of contracting.

When the negroes cut up his cotton, or any thing went wrong with him, he laid it to the conjurers.

Kelly generally attributed every thing to the witches. When his negroes stole any thing or ran away, he said it was the witches. His judgment seemed to be good in business matters. He did not suddenly break off his conversations.

When his negroes misbehaved, he said they were not to blame; that the conjurers made them do it.

He knew the value of property.

Heard conversations about witches, low-grounds, crib, &c., &c., and woman being hung in his father's barn, as other witnesses. Did not mix " witch talk " with business.

The business transactions I had with him were to tell prices of things, and measure timber at the mill.

JOHN BURNS.—Knew Kelly fourteen or fifteen years. Had business transactions with him; sold him pork and bacon, and bought bagging of him. Saw him last in 1857. Talked sensibly on business.

Talked of witches. He did not talk witch talk every time I saw him.

—— BROCK.—Knew Kelly from 1852 until his death. Witness attended to a mill, and often saw Kelly. Saw Kelly sometimes hunting his hogs, and he talked upon this subject as other men. Seemed to understand the value of property. Had as good understanding as any one witness ever talked to. Kelly was a man of sound mind.

Kelly talked of politics like a sensible man. Witness did not know whether Kelly was right or not. Kelly talked about the North Bank going down. Kelly talked about Washington, and told witness about the "old Revolution battles."

This was all the testimony introduced to sustain the will.

The petitioners then read in evidence several letters written by Joseph P. Kelly, dated August 21st, 1852, April 18th, 1847, August 19th, 1856, and October 7th, 1850. The one of October 7th, 1850, is given as an illustration of the character of all of them. It has been corrected as to its orthography and use of capitals to some extent.

MISSISSIPPI, YALOBUSHA COUNTY, *Oct. 7th*, 1850.

I am going to pleage you again. Them conjuring creatures have got me at such a pass that I can't go in my plantation. I haven't seen any of my crops this year except about ten acres of new ground, and I am coming to nothing fast enough. I begun this year as much as $250 in debt. I am sorry I have nothing good to write, but falsehood do not generally end in profit.

I wrote to you about my father's trying to hang me at the persimmon tree. If that creature is alive he can be traced up to the satisfaction of any one who wants to know the truth, if not for legal punishment. His daughter was at the spring with your sister Nancy, then I went to dinner that day. They make my hogs eat up my chickens and turkeys, and sometimes the sows eat up all their pigs, and they bewitch and conjur nearly everybody I have any thing to do with. They have conjured up such a condition for Douglas that I can't keep him at home. Right or rong, he could see no peace, and one of my neighbors was going to Texas, and I gave him his choice to go with him, and he went. Two fellows had whiped him nearly to death and he made a start to the North, and got in Oxford jail. It is very hard on me. Douglas had just got so he could take the ruffest off me. One of the fellows who whiped him has since been shot, and the other broke jail and is in the Mississippi bottom. Them conjuring devils are as much worse than old

Sampson as hanging is worse than killing a hog at ———.  I never knew of the negroes hanging anybody.  They both work by the same arts of charming.  I have been plauged by one, and overpowered by the other.  Them devils conjured me to Hogwood and preached my funeral.  The hanging they gave me in Gregory's horse-stable.  It was their conjuration that made their people believe I killed Tabb's son.  I think I have told you that man came to Randal's the 2nd Saturday in August, 1807, and said to me if I would come over to his house he would be a father to me.  My answer to him to believe I was going to do so.  Great God deliver this world of conjuring devils!  This man always dreaded me as the owner of that property in Petersburg, and in 1803 Anna Hartwell showed me some writing.  She never said who wrote it, but I expect it was him notifying that he would do that business for poor me.  I had such a load of conjuring upon me. that I could not understand words much less than signals.  It was the time I was going by the school-house when she stoped me, and said they had run Tarpley off and that my books was ·there.  You are old and heavy, but I want you to get some one to go over and see them people.  Cato Mead was at Petersburg 1810, when that came in the street between the town and warehouse.  I went out to him,—spoke.  He said he never see me without thinking about his son, and said they all said I done it.  Mr. Mead was at the warehouse good part of the day, but he then noticed me talking with the man I can't say.  If he did he knows there is some truth in this.  I think he could hardly believe he was accusing me of murder.  I think I have told you about them trying to take me up the Saturday before Christmas.  The next year I came by there again on Tuesday, and there is not a man on this earth that would go through what I did for every thing on it.  It is locked up in perfect darkness yet, and I expect I have spent twenty years from then till now thinking about it.  Old Catoe is the man; try and see him; if you can't do it, send Pachel Hartwell,—perhaps he may know them.  Show him what I have wrote to you.  Tell him all you know, bad as it is.  I am not mistaken about it.  It was the fall of 1808 I lived at Major Claborne's.  It was all a

be-conjured case.   My recollection is that I got to the river, and there was a parcel of men floating about the canoes, and this brother of mine I think was with them, but from whence they came and whither they went I know not, for years of woe and conjure shocks.   This man's sons got off, and I suppose they thought I had killed him.   They can make people believe that they see things that have no real existence.   Several times lately made my food look like it was all in a gore of blood.   I have many bewitched about where he was in Georgia.   Tell them I left him at Magee's in Georgia, 8 miles from Greens-burg.

  \*  \*  \*  \*  \*  \*  \*

I went back in 1815 to see if I could find him.   The conjuring was so heavy, I could find no peace—looked like the one when I left him.   McGee went from Petersburg to Warrenton, N. C., and from there to Georgia.   He said he had bought land on the Alabama river, and intended moving next year.   I rather expect Tabb went with him, but this is conjecture.   He might have known McGee, but McGee would not have known him. I have told you how he came to bed to me of nights when I slept when he could.   He was in bed with me when them men inspected my saddle-bags.   I expect they do that business in Petersburg; if they do I want them to send me some money; if they do not I suppose it is gone from me forever.   If it was not for them conjuring devils I have got enough with me to do well if Douglass is alive.   Emma has eleven children, seven of them in the field.   The girls about a month before they had their first children, that conjuring devil gave them a fall, and each was about a month like to die—up night and day.   The youngest has another about a year old as likely as I ever saw, and will have another in a few days.   If I could break these conjurations I could make enough in one year to do me, instead of bungling along and getting in debt.   It has taken four acres to the bale for several years, and I don't expect to get one for six this.   Ten years ago I made 8,000 of baled cotton; that was the only year I ever made any thing like a bale to the acre.

The two last years the bale worm eat up my cotton.   This

year the grass and drouth.  Cotton is only good on fresh low ground.  Corn forward is only common ; late very short.  This is the third year since Douglas went to Texas.  Carr in his. last letter said nothing about him.

I have a notion of going myself.  I told Carr if I could get off, and that conjuring did not know where I was gone, I should go.  I directed to put Douglas to blacksmithing or bricklaying, as he had not done so.  Douglas is strong, active and intelligent.

Dudley makes hardly a common hand.  I have one that was hardly a year old when I was with you, that out-hoes him, and can cut a log off first.  It is that creature that was at the Springs with your sister that does that conjuring.  I tried to get Major Green to go and see them people, but she had her charm on him, and he went wild on that account.  I would have tried George Goodrich, but am affraid to mention it for fear he would go wild.

You may not be affraid of the truth of this, for they came after me the fall it happened.  I came over to Tabb's father that night; the only night I ever left home in the week.  I met them the next morning against old Mary Harrison's ; it appears they did not know me, or we would have had a conflict at once. I went to Petersburg the time you turned back, and he followed me then 12 or 15 miles, but never molested me.  I can't say I felt like I did when he came over and drank the bottle of wine, and heard old Black tell stories.  The next time was in 1807, when Mr. Mead was there.  I thought Paul Nash done that business, but on close thought I believe the books were brought and given to him in the street.  I never thought of his meaning I had killed his brother, until I came back from Georgia, and gat my head a little out of their conjur bag ; then I saw how I was, and have known ever since.  O! that I could breake these conjur clouds off of all these things it would alarm the world. Mr. Wilkins once enquired of me if I knew where the pleague was.  She was at old Bottom Steagall's ; you remember the time he whipped them negroes at the court-house.  I expect she was the cause of it.  Did you hear what Mag Claibourn said to him?  Major Claibourn don't believe in witches ; she made him

speak to old Bottom. She is the pleague that started him with his gun to shoot me after they had killed old Bottom. She gat to such a height, that I remember enquiring of Mr. Organ's overseer if he knew whether Ned wanted her there. I told him if he did not I would moove her; I could do nothing while she was there, and she found out that I was in earnest, and let me alone. I much question whether Edward Stagall ever knew of her being there. But, alas! she wont let me alone now night nor day, and distance makes no difference. You will remember this was done before I studied out her conjuring or how she done it. Now whether she set Mr. Wilkins to enquiring to see whether I knew or not, I can't say. She knew that I had seen her there, but at that time did not think of her.

I write in a mighty disjoined manner, but you must make the best of it you can. I am in a bad condition; I shan't make more than half the corn I ought, and a third of cotton. Gracious God deliver this world from conjuring devils. If David or Clem Williams are alive they must have noticed me talking with that man, for I went from where they were at work to him.

If I could only call the time back again when I got home that night from Howelton. She had her conjuration with the negroes. I had not heard one call another a liar in a year, and as good a boy as I ever saw was cursing and swearing. Are there no devils in hell? .O! if she was only in hell she would be done tormenting me. She is the very creature that was at the spring with your sister Nancy, and if traced up well will be found to be the same that was at old Bottom Stegall's. One of the tavern boys that day in Petersburg had just such a fit. I think Powell asked me what he must do with him. I told him he must break him or sell him. If it was to do over again I should tell him to give them conjuring devils their dues, and then the negroes would behave themselves. That boy of Wilkins I know will be a good one, and so might the other.

Merciful God deliver me from this conjuring devil! I have been several days writing. I write as I can. I think I can trace them devils to be the cause of all my troubles. The old

man's conduct had a great deal to do with it.  But he saw much uneasiness about it.  I was standing in the path one night when he came by from that old blind fortune-teller's in the dead hours of the night with Lucy behind him.  Many was the time I thought about that man, and who he was before I found out Paul is the only man in Petersburg that I have any knowledge of at this time.  I think we never exchanged a half a dozen words, and I can't write to him, as I should have done so many long years ago.  You will remember it was 7 years before I found out the cause of their treatment.  I have waited 10 years to see if nothing would turn up to bring things right.  I then went to Georgia to see if I could find him, which has been 25 years ago.  If that old field of mine will be of any service to you, go to work on it, and if get this thing righted you will merrit many more.

We have a man in Granada teaching conjur school.  They say he can make a man puke at his pleasure.  Some of the wags say it will be a fine thing for those who have scolding wives, as they can still their tongues.  I am living 2½ miles from Coffeeville, on the Pontatoc road.  It is now a Tellagraph road.  They have a wire running from New Orleanes to Nashville, and I expect from there to all the Northern towns.  We have no office nearer than 18 or 20 miles, and I have never seen how they communicate.  It is a mistry to me.  I can understand the lightning runing the wire, but how they make it talk, that is the part I don't understand.

In the course of the summer I dreamed of flying about where they first got me.  So I know nothing, if they havn't got Powell conjur stricken.  He knows them people and where they live.

Yours, respectfully,

JOS. P. KELLY.

To JNO. WILLIAMS.

MR. JESSE KELLY:

DEAR BROTHER:—I have taken my pen in hand to write to John Williams to know about them conjuring devils in Virginia.  You will see what condition I am in by my letter to Jno. Williams.  I am in tolerable health.  My crop is sorry

this year. I am afflicted with rheumatic pains. You will please send this letter to Jno. Williams if you can find out where he lives, and oblige

. Your affectionate brother,

JOS. P. KELLY.

To Jesse J. Kelly.

The letters not here inserted refer to the same subjects as this letter,—the loss of Tabb's son, and the fact of suspicion resting upon the writer of guilt in connection with his death, and to the exchange made by the midwife of an infant brother for a female child, and his search for his brother, and the influence of witches. Some of them refer to the same persons, and detail the same facts.

The depositions of WINFIELD PHIPPS, GOODRICH, PARISH, and others, state, that in 1815 to 1826, and about that time, they knew Joseph P. Kelly in Virginia. That he was first a man of reading and sense. He afterwards, as early as 1815, became deranged. That he had no brother whose history was unknown; that he had no lost brother; that they never heard of Tabb or his son, and that Kelly was never suspected or charged with any crime in any way. They prove generally that all these matters named in his letters were fictions or creations of his diseased fancy, &c., &c., and that he was thought to have gone crazy on account of a love affair. He thought his mother was a witch, and he was for a while confined to prevent his doing violence to her.

B. F. GIBSON.—Knew Kelly in 1830 or 1835, in Alabama; Kelly then talked of conjurers and witches. Witness slept with Kelly, who frequently alarmed him by getting up at night, saying the witches, conjurers, devil and the damned were after him.

Witness met Kelly again in this State in 1852–3. Kelly talked then just as he did in 1830 and 1835. Sometimes, for a very short time, Kelly talked rationally as any man, but would soon get to talking of conjurers. Kelly, from what he

said, thought himself to be under the influence of witches. This subject seemed ever on his (Kelly's) mind.

Witness did not think Kelly a man of sound mind from the time he first knew him. At times he thinks Kelly might have disposed of his property, but if it consumed much time, he thinks he would get off on the subject of witches. Thinks he could not do any business that required the attention of his mind for some time. Kelly would abruptly break off from other subjects, and talk of witches. He would talk a short time sensibly,—perhaps fifteen minutes,—and then break off.

Kelly in 1854 wanted to lease a place in the bottom of witness, which witness refused to do, because he did not think him capable of contracting, and because he did not want a crazy man near him.

Kelly talked mostly of things that happened a great while since, and but little of recent matters.

JAMES CRENSHAW.—Knew Kelly in 1840, and for a few years afterwards; then for several years he did not meet with him, Kelly having moved so often.

Kelly would talk a short time rationally, and would then fly off about his witch notions. He was an inoffensive, kind man, but attributed every thing that happened wrong to witches. Witness tried to convince Kelly that all the witches were put to death by Saul, but Kelly said he did not believe it, and that the witches that troubled him were the descendants of the witch of Endor.

On one occasion something was said of the Pope of Rome, and Kelly stated some fact about which witness thought he was wrong, but Kelly proved himself right by reference to Hume's History of England.

Kelly could be kept talking rationally a short time, but this depended entirely upon the person talking to him holding him to the subject.

In 1846 or 1847, witness went to Kelly's house; talked upon every subject, flying from one to another. Witness slept with Kelly, and he told witness what is related in his letters substantially about his lost brother, and of the preacher being led

out of church backwards, of being hung by his father on a persimmon tree, &c., &c.

Kelly talked of things that occurred long ago. Kelly had an aversion to women—would turn around if one would sit down facing him. Witness had often seen him do it. Described Kelly as being a stupid-looking man; seemed to be always in a deep study. It required an effort to keep him off from the subject of witches, &c., &c. He might have been held off half an hour by an effort on the part of the person conversing with him.

On ordinary matters he would talk rationally as long as you could hold him to it. You could hold him on a subject longer than he would otherwise talk of it.

Witness considered Kelly partially deranged, and if the law requires a person of full mind to make a will, Kelly could not do it.

Witness thinks that a man in whom Kelly had confidence might have induced him to do almost any thing. He generally had a man to do business for him; never knew him to make a trade of importance.

H. WALTON testified to about the same facts proved by Crenshaw, and they had about equal opportunities of knowing him.

G. M. BELLAY.—Became acquainted with Kelly in 1845. When witness first came to Coffeeville, H. B. Carr transacted Kelly's business, and when he left he employed witness to do so.

Kelly talked rationally for short time in business, but would go off on witches. Kelly told him he had been miserable for forty years. If any thing went wrong, he attributed it to witches, —would not let him go to his fields, &c.

Kelly was crazy about witches. Witness had doubts of Kelly's capacity to dispose of his property. Talked with Kelly as little as possible, as his conversation was not agreeable.

Witness had generally to go to Kelly's to get him to haul his cotton, or have it done for him until he got a wagon. Kelly's eccentricities seemed confined to witchcraft and conjuration; apart from this he talked rationally.

Kelly would break off suddenly from one subject to another in the middle of a conversation, and cry.

Witness was once at Kelly's house making a settlement with him. Kelly got up, went out and sit down in the yard, and when witness went to him he commenced about witches; that he could not go to the spring, and commenced crying, and said that old Mrs. Elsey had —— in his spring.

Witness made out his accounts, and Kelly assented to them; Kelly was generally very melancholy.

ROBERT BROOKS.—Became acquainted with Kelly in '38 or '39. Looked upon Kelly as a deranged man; hunted with him, but was sorry for him, and did not let Kelly say much to him about witches. Never saw Kelly smile or laugh; saw him cry once when he said the witches were after him. Never knew Kelly to leave home and return by the same route. He said the witches would not let him. Kelly looked stupid, and held his head down.

Kelly, when talking of farming, would go through the subject before he would commence on witches. Never talked as much as an hour with Kelly that he did not talk of witches. Saw Kelly but once in the last four or five years.

PETER SMITH.—Saw Kelly first in 1848 or '49. Done some work for him. Slept in his house. When he waked, he found Kelly on the floor; he said the witches annoyed him so as to make him get out of the bed. In 1851, was there again at night. When conversing with Kelly, he sprang up, backed up to the door, striking his head against it, and exclaimed, as he stood stamping on the floor, "Come up, devils, and do your best at once!" Have not seen Kelly since.

He contracted with Kelly to do the work for him. He talked sensibly on business. He was a sober, steady, prosy-looking man; never saw him laugh.

W. C. BELL—States about the same facts in relation to Kelly as stated by Smith, the preceding witness.

WM. ELSEY.—Knew Kelly in 1840; but did not become inti-

mate with him until 1852. Never saw any thing wrong about his business. Talked about witches and conjurers. Sometimes, when Kelly was sick, he would ask him how he was. Kelly said the conjuring witch would not let him rest, or would not let him make water. Kelly was afraid to go to his fields, or into a lot. Talked of his lost brothers; hanging of a woman in his father's barn, &c.

When Kelly was talking on any subject, he would suddenly fly off.

JOHN NULTER.—Knew Kelly in 1829 or '30, until his death. Stayed with him all night some time since. Kelly talked rationally as long as he confined himself to his subject, but would fly off. Kelly told witness that the first time the witches had any thing to do with his family was in exchanging his brother for a girl child. Kelly said he had hunted for his brother, but the conjurers would lead him off the track, and he could not find him. Found his brother in a machine shop in Virginia or Georgia, (witness does not recollect which.) Kelly said he knew it was his brother because they both became speechless, and burst into tears. Kelly said the girl child was regarded as his sister, but was not. Told witness the same story as named by Kelly in his letters in relation to hanging his father on a persimmon tree, and of a woman hung in his father's barn, and that he, Kelly, was accused of hanging her. That, in 1835, he went back to Virginia, but would get lost, became blind, and that an old black dog his father once had would lead him off another way, and tell him there was danger ahead. Kelly said when the negroes done any thing wrong it was the witches, and the negroes would be killed if he interfered.

On one occasion a negro woman was plowing; she stopped and rolled up her eyes, and pretended to be bewitched. Witness was with Kelly, working together, and he punished the negro woman, and Kelly ran off, saying, the witches would kill us all Witness relieved the negro. Kelly was frequently imposed on in this way. Witness, after this difficulty with the negro, started to the house, and found Kelly, with his hat over his eyes, plowing up the corn. Witness was irritated and thought Kelly was

plowing up the corn because he had corrected the negro, and he slapped Kelly in the face. Kelly did not resent it, but cried. He said the conjurors made him do it. Witness told Kelly they should not bother him any more while he lived there. Witness had but little conversation with Kelly afterwards, as Kelly shunned him.

·In 1851 or 1852, while witness lived in Coffeeville, he went to stay all night with Kelly. Kelly said he could not swallow his bread; that the witches would not let him, and that they had thrown him from a log in the creek.

Kelly talked rationally about business while he could be kept to the subject. Would occasionally talk sensibly for hours, only he would break off, " Oh, forty years ago !"

Witness thinks Kelly could be overreached by a man in whom he had confidence. Kelly never made a trade of any amount without some person to aid him. When a man had Kelly's confidence, he did not believe he could do wrong; but if you lost his confidence, you could not regain it. Never knew anybody to overreach Kelly in business.

Sometimes saw Kelly half dozen times a month, sometimes did not see him for a month, once did not see him for a year. Kelly often talked of government matters and great men, saying, such men would have been great men had they not been conjured. Kelly said all of them but Washington were conjured. Witness ridiculed the idea of witches and conjurers. Kelly said witness was as much under the influence of witches as he was, but had not sense enough to know it. Kelly would talk sensibly enough for hours, only breaking off now and then, saying, " Oh, forty years ago !" and crying.

Witness never saw Kelly after 1856. Kelly did not turn witness off for slapping him, but went to witness' father's for two or three days, and returned. Witness was afraid of him when in his conjuring fits; was the reason he quit him.

H. D. BRIDGERS.—Became acquainted with Kelly in 1844 or '45, and knew him until '50 or '51, at which time witness moved to Tallahatchie county, where he remained until 1856, and then moved back to Yalobusha county, about twenty miles of Kelly.

On the 1st January, 1857, he moved near Kelly. His field was within one-fourth or one-half mile of Kelly's house.

When Kelly met a man, he would pass the ordinary salutations, and talk sensibly as long as you would lead in the conversation; but so soon as you quit and let him lead, he would go off on the subject of conjuration, and about his lost brothers. Kelly told witness that the first time the "conjuring bitch of a devil" got hold of him was when he went to a church called "Old Oak Church," when they shut the door of the pew he was in, and the preacher came to him and said, "There is danger here." Kelly said, "How did he know there was danger unless he was a witch; he was as much bewitched as I was."

Kelly spoke of a lost brother, and said his father and mother did not know of his existence, but he, Kelly, knew he was his brother. Kelly told witness that he once found this brother, whom he called Tom, in a machine shop, fifteen miles from Petersburg. Kelly said he recognized him, but could not speak to him. Kelly said, when he started to go out five men placed themselves at the door and said, "We have got you." Kelly said, "I am going out of here." The men said, "You may go, but we will get you yet."

Kelly once told witness that he and Colonel —— were once hunting a runaway negro, and came to a pile of ashes in an old sedge field. The pile of ashes were rounded up, and Kelly stirred them up. He said they could not get out of the field, but would wander around and around, and come again to the ashes. Finally, they piled them up and were able to make their way home.

Witness had noticed strange traits in Kelly's character. When witness would be in his field, where his negroes were at work, Kelly would approach him so stealthily that he would be able to place his hand on him before witness would see him. Kelly often done this when witness was at work in his new ground where there was brush. Kelly wore an old white sloped hat over his eyes, and witness never saw him with it off except when he was in bed sick,—always wore it at the table, and would not look at any person with whom he was conversing. Heard Kelly speak of going to Georgia to look for Tabb. He protested

he was innocent of the charge of killing him, but the witches would not let him find Tabb. Heard Kelly say he was in the room when his father was holding prayers, and the witches made him get up and go out of the house backwards. When Kelly was with witness in his field he asked him to go home with him, and he would show him a fine-looking woman. Kelly burst into tears, and said the best-looking woman he ever saw was hung in his father's barn with a hair rope. Kelly told him that once Nancy Williams was at the spring, and the "conjuring bitch of a devil" was there, and he tried to kill her with a battling stick.

Kelly told witness that he once had a sister burned to death, and when she was to be buried, an old woman came with a rock in her apron and took the child and had the rock buried, and his parents always believed the child was buried.

Kelly talked about these things very often, and repeated them on very many occasions.

Kelly was a melancholy man; never saw him smile or laugh. Witness does not know how his eyes looked, for it was difficult to see them, on account of his hat.

Kelly was subject to sudden emotions, and would frequently burst into tears.

Told witness he could not go to his crib, meat-house, field, &c. Said he had not seen the inside of his crib for four years.

He accounted for all accidents or misfortunes from the influence of conjurers.

At one time, when witness was at Kelly's, the little negroes were crying in the yard, and Kelly attributed it to conjurers, and said if he went out it would make them worse.

Witness was at Kelly's frequently; living in half a mile in 1857 to the time of his death.

All the books witness saw there was a medical almanac and a New York paper, that witness supposed belonged to Kelly's negro man, Douglass, as his name was on them.

Witness loaned Kelly some books to read, but Kelly said he could not read them; the conjurers would not let him; that he went blind. Kelly said he could not sleep for conjurers, and had not slept soundly for forty years. Kelly lived like a hog.

He had two plates and one cup and saucer, an old bedstead, an old feather-bed, a cot, patched again and again, two or three chairs, and a safe nailed up to the wall. Witness went there once at meal-time, being there by Kelly's request to assist about rolling his logs. Witness did not eat at dinner, because of its bad quality. Witness valued all his furniture at five dollars.

Kelly said he had not been to an election in forty years. Kelly had twelve hands and made eight bales of cotton in 1857, the year witness was near him. Witness ginned the cotton and put it up for Dr. Miller, (he having been appointed executor.) Kelly quit plowing horses, and plowed oxen, because he said the horses were so bewitched they could not plow. Witness told Kelly if he would take mules or horses he would swap some work with him and send his hands to plow for him, and he would insure the horses not to get bewitched. Kelly replied "that he had seen as big fools as he was before."

Witness went to Kelly's on the day the will in controversy was executed. Soon after witness came in, Miller handed the will to Kelly and said, "Uncle Joe, here is that will." Kelly asked Murray to read it, and when Murray commenced it witness stepped out. When Murray was through, witness came back. Dr. Miller set a chair by the bed-side and brought up a piece of plank on a three-forked limb to answer for a table. Miller helped Kelly off the bed into the chair, and squatted right by his side and pointed out the place for Kelly to sign his name, saying, "Here, Uncle Joe, this is the line; sign right here." After Kelly commenced writing his name Miller said, "You have not got room there, Uncle Joe, go back here," pointing his finger just below. When Kelly signed the will, witness was close by and saw him sign it. Witness is positively certain that the seal opposite Kelly's signature was not there at that time. Thinks the word seal opposite Kelly's name is not in the handwriting of the draftsman or any of the subscribing witnesses. That the ink used is paler than that used by Kelly or the attesting witnesses. It may be because the writing is lighter.

The way witness came to be present at the execution of the will is this: he was at Adams' house when Kelly's man Doug-

lass came in a great hurry, riding Dr. Miller's horse, for Adams to go over to Kelly's. Witness knowing Kelly was very sick from having seen him the day before, supposed he was dying, and went with Adams. When he arrived there, he found Murray, Miller and Chapman. When he went in and spoke to Kelly, who was lying in bed with his eyes closed, Kelly handed witness his hand, but did not speak. From his appearance, witness thought him as sick a man as he ever saw.

After the will was signed, Miller helped Kelly to his bed, and offered cigars to Kelly and the company. Kelly declined, saying he preferred the pipe. Witness stayed in the room about twenty-five minutes and heard Kelly make no other remark. Miller done the talking during the execution of the will.

Witness had had a conversation with Adams about his making an affidavit proving the will. Adams said that he did not know when he signed the will that he would have to make any oath; that he thought he would only be called upon to state he saw Kelly sign it. I repeated to him a portion of the oath; he would have to swear "that Kelly was of sound mind and disposing memory." He said he would not make that oath for all the property Kelly had, but he would swear he was as much so as he had ever seen him, naming his witch belief as exception.

Kelly's conversation was connected so far as conjuration was concerned, but on any other subject he would jump from one subject to another.

The letters read are a very good sample of Kelly's mode of conversation. I was with Kelly much of the last year of his life and saw no change in him up to the day of his death.

Witness was at Kelly's often during his sickness, and he talked then as he had always done, except that he talked less, being weak.

Kelly stated in some of these last conversations, about a week before he died, that sometimes, when he would break bread at his table, it would turn into blood. Kelly told witness about the same time of a mill that he intended to build at his spring, which mill would run by water pumped from the spring, and which would pump water to run itself, and all the water that

would be lost would be by evaporation. This was about a week before he died.

Kelly told witness that he had a sore on his penis, and when he would get up in the night to make water, the "old bitch of a conjurer" would grab hold of his penis and would not let him, and this he said would nearly throw him into spasms. The conversation about the mill was in the week before the will was made ready.

Kelly asked witness if the witches had not killed Baker; that he had told him they would do it. This was soon after Baker died.

Witness does not think, looking to the facts he knew about Kelly and his condition at the time he made the will, that he had capacity to do so.

Kelly was correct in his letters as to a telegraphic line passing his house; was correct about a tornado in Grenada. Witness knows Adams; believes him an honest, correct man.

Witness, when asked the reason why he stepped out when Murray commenced reading the will, said it was from feelings of delicacy, and remained until he thought it was through.

Witness advised the relatives of Kelly that the old man was dead, by letter.

Had witness been a stranger to Kelly he could not have formed any opinion as to Kelly's capacity from what occurred on the day of signing the will.

Witness often heard Kelly, during his last sickness, exclaim, "Oh, God, burst these dark clouds of conjuration!"

Witness thought Kelly was induced to make a will that he would not have made if sane, and thought Kelly's relatives ought to know of it, and a letter was written to them by Mr. Herron, at his request.

Witness observed that he was always secretly watched and listened to, when visiting Kelly in his sickness, by Kelly's negroes.

—— CHAPMAN.—Testifies to about the same facts as Bridgers, he having been present at the execution of the will. This witness was in the house when the will was read to Kelly, and

relates what Kelly said about a portion of the will being contrary to his wishes, as detailed by other witnesses.

W. B. JOHNSON.—Lived near Kelly, and visited him often. Visited him in his sickness. Kelly spoke of his lost brother; related the Tabb story, as detailed by other witnesses and in the letters. Heard him complain of witches preventing him from urinating and eating, as detailed by Bridgers. This was two days before Kelly died. Kelly talked but little in his illness. Apart from witches he talked sense.

THOMAS NEELY.—Knew Kelly well; lived near him.
He related Kelly's conversations, similar to those described by other witnesses. He once went to Kelly in the field, and Kelly was directing a negro to take a horse out of the plow. The witches he said would not let it work. He told the negro to take the lines with him to the house, and tie the witch there, but then told him not to do so, for fear the witch would get hold of him. The horse was fretful because the gears did not fit him.

D. T. WEAVER.—Knew Kelly since 1843. Was at his house about two weeks before he died. Kelly was then very sick. Kelly said he would be willing to die if he could only go back to the old country and kill the old witch. Kelly often waked in the night and said he had not slept sound for forty years. Kelly would not talk long without breaking off on the subject of witches.
Witness sold Kelly a horse; let him have him on trial; when witness went back, he, Kelly, asked the negroes if the horse would do. Witness had left him that he might get his neighbors to look at him, for he did not think Kelly competent to trade.

JAS. WEAVER.—Lived with Kelly in December, 1856. Heard Kelly say he wanted his brothers to have his negroes, and heard him say he would give them to Miller. Kelly said the negroes said his brother Joshua would not have them. Apart from witchcraft Kelly talked well enough.
It was in 1857 Kelly said he would give his negroes to Miller.

Dr. M. D. Means.—Saw Kelly twice; thinks it was in 1856; Kelly was in town. Witness had a small bill against Kelly for ginning cotton, and dunned him. Kelly would not examine the account, but sent witness to Carragee. Witness had heard of Kelly's peculiarities, and, in order to try him, offered to trade horses with him. Kelly said the horse he had in town was the only one that the witches would let plow. Witness tried to convince Kelly he was mistaken, but could not do so, and Kelly went on to tell him all his witch notions, and broke out crying very loud. Witness left him. From these circumstances witness regarded him a deranged man, but had only a short interview.

Dr. Gorin.—Saw Kelly twice. The last time I saw him was when I went out with Dr. Miller to see him. He found Kelly dying, and he soon died.

A. Turner.—Stated that after Bellany left Coffeeville that he attended a little to Kelly's out-door business. Witness then recommended Kelly to get Carragee to attend to his business, and Kelly done so.

Witness says the letters read in evidence are a fair sample of Kelly's mode of conversation.

Then closed petitioner's testimony. Miller's counsel examined a few other witnesses, but no new facts were elicited in any way.

The appellants made the following assignment of errors:

1st. It was error to permit Miller, who was a devisee and legatee under the will, as well as executor, to testify in the cause.

2d. The decree sustaining the will is erroneous, and is not sustained by the law or the facts.

*F. M. Aldridge,* for appellants,

Argued the case orally, and filed an elaborate brief, in which he insisted that in the progress of science there had been a great advance made in a knowledge of the disease of insanity. While law, being based mostly upon precedents, had been slow to follow the clear deductions of scientific research, it had to some extent been changed and improved. The work of improvement was

not yet completed, but as mental science was better understood, it would necessarily change and modify the rigor of the common law, which had its birth in an age when insanity was regarded a crime rather than a misfortune.

Insanity is rather described than defined by authors. It is conceded, "where there is a delusion of mind, there is insanity; that is, when persons believe things to exist which only or at least in that degree exist in their imagination, and of the non-existence of which neither argument nor proof can convince them, they are of unsound mind." *Dew* v. *Clark*, 2 Eng. Ec. Reps. 441; Jarmin on Wills, page 28 and note.

That the testator was under the influence of strong delusions that no reason could change, does not admit of question under the proof in the cause.

It may, however, be insisted the will was executed during a lucid interval. What is a lucid interval? It is thus defined by Lord Thurlow: "By a lucid interval I do not mean a cooler moment, an abatement of pain or violence or of a higher state of torture—a mind relieved from excessive pressure, but an interval in which the mind having thrown off the disease, had recovered its general habit." *Attorney General* v. *Pranther*, 3 Bro. Ch. Rep. 234; Rey's Med. Jurisprudence, 323.

It was insisted that insanity only existed when the brain, the organ through which the mind acts, was diseased, and that in all cases where this disease was fixed and incurable then there was no such state as a lucid interval—that such indications were apparent and not real, and that investigations in medical science had established this fact. To sustain this position the opinions of eminent medical writers were relied upon, especially in the case of Parrish's will tried before the surrogate of the city of New York, in which case many of the most medical men of the age gave their opinions. Parrish will case, page 398; American Jurist, Vol. 19, 389; Rey's Med. Jurisprudence, p. 68.

"While the doctrine of lucid intervals as explained by the language above quoted (Lord Thurlow) is upheld by scarcely a single eminent name in the medical profession, we find that their existence (lucid intervals) is either denied altogether or they are regarded as being only a *remission* instead of an intermission of

the disease—an abatement of the severity of the symptoms, *not a temporary cure.*" Rey's Med. Jurisprudence, 321.

In England the exploded theories of the past are discarded.

The reasoning of that distinguished scholar and jurist, Lord Brougham, is conclusive and unanswerable on this subject:

"It may therefore be considered as the present law of England, that a person partially insane is incompetent, so far as the making of wills or contracts is concerned, though as yet there has been no attempt to adopt the rule in this country. In fact its practical operation would be attended with many difficulties. It is true there are many cases, such as that just commented on, in which the particular monomania overshadows the entire intellect, or where it at least infringes upon the peculiar province of testamentary capacity. But it cannot be denied that, in practice, cases of partial insanity or monomania frequently occur, in which there is an inflection of reason so definite and appreciable, as to make it impossible to exclude it from the general class of delusions, and yet which is found to be perfectly consistent with right reason, and with recognized business capacity in other respects." Wharton & Stillé, Med. Jur. § 18.

If the foregoing position is regarded as untenable, it is insisted that a general rule may be declared from all the discussions "that when there is doubt as to the sanity of the testator at or about the time of the execution of the will, and insanity has been once clearly proved and the will is inefficacious, that fact is conclusive that there was not a perfect restoration of the powers of the mind." In most cases great stress has been laid upon the fact that the will was proper and natural. *Cartright* v. *Cartright,* 1 Phil. Ec. 90; *Scruly* v. *Finch et al.,* 1 Adams Ec. 52; American Jurist, Vol. 36, 52; *McAdam* v. *Walker,* 1 Dow, 178; *White* v. *Driver,* 1 Phil. Ec. 84.

It is clear that this case comes under another well-recognized rule; that is, where the subject upon which the testator was insane was in his mind at the time of the execution of the will. Upon this subject the case of *Dew* v. *Clark,* Eng. Ec. Rep. 496, is relied upon. Upon what subject was Kelly insane? Upon the subject of his relatives. He believed he had a brother who never had any real existence. Could he make a will without

this subject being present in his mind?    What we would deduce from reason is proved by Martin, when Kelly tracks off and says, "but that unfortunate affair—but you believe nothing of it." It is clear from other proof what it was that Kelly alluded to, to wit, the loss of a brother, who was exchanged for a female child by the midwife without the knowledge of his parents.

Upon the influence of Miller in procuring the will the following facts were relied on:

1. Miller procured Martin to go to Kelly's to write the will.

2. When they arrived there it was Miller who introduced the subject of the will.

3. It was Miller, not Martin, who carried out the will when it was prepared.

4. It was Miller who selected and carried out the subscribing witnesses.

5. Miller had the second will prepared, and carried it to Kelly, and sent for the subscribing witnesses.

6. Miller raised Kelly from the bed, and pointed out the place of signing, saying "Here, Uncle Joe."

7. Miller calls the subscribing witnesses to attest the will, and Kelly does not call on them.

8. Miller offers an argument for Kelly in the will against his relatives, which Kelly objects to but yields. It is Miller's will using as a tool a mind that was destroyed.

*E. S. Fisher*, on same side,

Made an oral argument, principally discussing the incompetency of Miller as a witness to sustain the will.   No memorandum of the argument is found in the papers.

*D. L. Herron*, on same side,

Filed a brief fully discussing the facts in the cause, which is too voluminous for insertion. He cited the following authorities: Combe on Mental Derangements, 208; *Mudway* v. *Craft*, 7 Eng. Ec. R. 551; *Marsh* v. *Tyrrel*, 2 Hag. 84; *Bridges* v. *King*, 3 Eng. Ec. R. 109; Lomar on Executors, Vol. I. 19; Wharton & Stillé, Med. Jur. 71, 206; *Chambers* v. *Queen's Proctor*, 2 Cur-

tis, 447; *Barton* v. *Scott,* 2 Rand. 403; 8 Mass. 371; 7 Serg. & Rawle, 9; 5 Pick. 510; 1 McCord, 430; 3 Robinson Prac. 334.

*J. M. C. Watson,* for appellees.

It is insisted the testimony of Miller was unimportant, as there is sufficient testimony in the record to sustain the verdict. The law is settled that although improper evidence has been permitted to go to the jury, still the court will not for that reason overrule the judgment, if there is also sufficient legal testimony to justify the verdict. *Barranger* v. *Nesbit,* 1 S. & M. 22; *Davis* v. *Black,* 5 S. & M. 226; Graham & Waterman on New Trials, Vol. I. 246; Same, Vol. II. 634; *Stephen* v. *Crawford,* 1 Kelly, 574; *Bradford* v. *Pierson,* 12 Missouri, 71; *McMullin* v. *Mayor,* 2 S. & M. 298.

Nor will a new trial be granted when the court erred in charging the jury. *Hallowey* v. *Armstrong,* 30 Miss. 504; *Hannah* v. *Renfro,* 32 Mass. 126.

The same evidence which would sustain the verdict of a jury in a court of law will sustain a decree in this case. *Gray* v. *Rodan,* 24 Miss. 677; *Dillard* v. *Wright,* 11 S. & M. 455.

A mere suspicion of undue influence will not destroy a will. 1 Jarmin on Wills, 29; *Taylor* v. *Kelly,* 31 Ala. 59; *Potts* v. *House,* 6 Geo. R. 325; *Dunlap* v. *Robinson,* 28 Ala. 100; *Gilbert* v. *Gilbert,* 22 Ala. 529; *Leverett* v. *Carlisle,* 19 Ala. 80; 1 Williams on Executors, 42.

"The influence which destroys the validity of a will is a fraudulent influence controlling the mind of the testator, so as to induce him to make a will which he would not otherwise have done." *Marshall* v. *Flinn,* 4 Jones, N. C. Law R. 199.

As to the capacity of the testator, no one can examine what is legal soundness of mind without concurring with Judge Lumpkin in the case of *Potts* v. *House,* 6 Geo. 349, where he says: "Before investigating this cause I had supposed that more capacity was required to make a will than I now find warranted by the authorities." In this case it was held "that neither eccentricity nor imbecility of mind, nor extreme old age, nor incapacity to make contracts for the purchase and sale of property, are sufficient to invalidate a will."

"Nor is it sufficient to show that the imagination of the testator was generally disturbed with a strange belief in witches, devils, and evil spirits, which he fancied continually worried him, and that he lived in the strangest manner." *Lee* v. *Lee,* 4 McCord, 183; *Mercer* v. *Kelsoe,* 4 Grattan, 106; 3 Hump. 278; *McMasters* v. *Blair,* 5 Casey Penn. R. 305; *Stephenson* v. *Stephenson,* 9 Casey Penn. R. 471.

In the latter case the court say, "The testator may not have been able to specify every part of his property, or name every one of his kindred, but was he competent to form the resolution and purpose expressed in his will? That was the entire question to which the attention of the jury should have been singly directed." "If some witnesses do depose to the contrary, their testimony is to be preferred which deposes he was of sound memory, as well as for their testimony tended to the favor and validity of the testament, as for that the same is more agreeable to the disposition of nature, for every man is a creature reasonable." 9 Casey Penn. R. 473; Georgia, Vol. 20, 709; Jarmin on Wills, 51; 4 Howe Miss. 482.

The argument commented at great length upon the testimony, showing that Kelly knew the value of property, talked and acted rationally, except on the subject of witches.

It was further insisted that his relatives could not, under the circumstances, set up any particular claim to the verity of the testator.

HARRIS, J., delivered the opinion of the court:

This case stands before us as on appeal from the verdict of a jury, on an issue in the Probate Court to test the validity of the will of Joseph Kelly, deceased, mainly on two grounds:

1. Because it was obtained by fraud and undue influence.

2. Because of the mental incapacity of the testator.

These are questions of fact, submitted to the investigation of the jury in the court below, in contemplation of law, upon a full and fair examination of all the witnesses on both sides.

Upon principles well settled in this court, their verdict will not be disturbed here, unless it is manifest from the whole

record that it was clearly wrong, or unless misdirection of the court or other error apparent on the face of the record may have tended to produce such verdict.

We have carefully examined the able and elaborate arguments of counsel, as well as the great volume of testimony before us, to ascertain whether the verdict in this record is *clearly wrong* in view of the evidence; and we feel assured by that examination that there is no error in this respect which it would be the province of this court to correct. The most that can be said on the part of the appellants in relation to the testimony is, that it is conflicting, and in such cases it is the peculiar province of the jury to weigh the evidence and give credit to those facts and circumstances which in their judgment are entitled to the greatest consideration. The law has wisely imposed this delicate and responsible duty on jurors, and it is not for courts (in such cases) to rejudge their judgment.

That the issue was in fact submitted to the probate judge "in lieu of a jury," by mutual agreement, does not change this result, as his judgment, under the agreement, must have the force and effect of the verdict of a jury here.

The only error in law assigned, so far as we are able to ascertain from the arguments of counsel, (no assignment of errors appearing among the papers submitted to us,) is, that the testimony of Miller—the devisee, legatee, and executor under the will—was allowed over the obligations of appellant.

On this point it is urged that inasmuch as by our Code (p. 434, Art. 45) a devise or bequest to a *subscribing* witness to a will is declared to be void under certain circumstances, that *any* devisee or legatee, whether a *subscribing* witness or not, is incompetent to testify when called to support a will in his favor.

There is certainly no force in this objection. The article relied on does not make even a *subscribing* witness *incompetent* to testify, but removes his interest by declaring the devise or bequest, under circumstances, *void* as to him. This article is a substantial, if not a literal, copy of the twenty-seventh section of the Act of 1822, Hutch. Code, p. 651; and having been adopted in the New Code at the same time with the provision taking

away the incompetency of witnesses arising from interest, the two articles are to be construed together.

In giving effect, therefore, to the Act of 1822, (now Article 45, p. 434, New Code,) it will not be extended beyond its term so as to interfere with the provisions of Section 17, p. 510, New Code, farther than its language requires. Miller is not, therefore, an incompetent witness under our laws, and was properly permitted to testify.

Let the judgment be affirmed.

NOTE.—This case was reported by F. M. Aldridge, Esq.