In the matter of the probate of the will of Timothy Jackman—First appeal.

In the Matter of the Probate of the Will of Timothy Jackman, deceased.—First Appeal.

PROBATE OF WILL : *Effect of verdict in proceedings to establish a will.— Proof of undue influence.*

1. On appeal from an order admitting, or refusing to admit, a will to probate, the circuit court may submit questions of fact to a jury, or not, at its discretion.
2. A verdict in such a case has substantially the same effect as a verdict on a feigned issue in chancery; and if it is clearly contrary to the weight of evidence, refusal of a new trial is error.
3. In this case a verdict that the testator was induced by undue influence to execute the will in question, is *held* to be contrary to the weight of evidence, and a judgment on the verdict is reversed.

   PAINE, J., dissents as to all the above propositions.
4. Undue influence in such a case is such an influence that the instrument is not properly an expression of the will of the testator in regard to the disposition of his property, but rather an expression of the will of another person.
5. Motives of natural affection and gratitude on the part of the testator, and solicitations or arguments which appeal to such motives, do not constitute undue influence.

   Per PAINE, J. :
1. Upon the question of undue influence the testimony should be allowed to take a wide range in reference to the character and feelings of the testator, and to include his declarations, both before and after the execution of the will proposed, tending to show his views in regard to making any will, or in regard to the one in question, or his habitual wishes as to the final disposition of his property.
2. *Direct* proof of undue influence is not required, nor usually to be expected.
3. The fact that the testator went to an attorney's office and procured the will to be drawn and executed, without any external or apparent constraint, is not conclusive proof that he did not act under the pressure of undue influence.

APPEAL from the Circuit Court for *Rock* County.

*Hiram Jackman* appealed to said circuit court from the decision of the county court admitting to probate a certain paper-writing purporting to be the last will of Timothy Jackman, deceased. The circuit court, upon the special verdict of a jury, reversed the decision of the probate court; and from this judgment *Anson Rogers, Allen C. Bates* and *Marcia M. Jackman*, the exec-

utors and executrix named in said instrument, and said *Marcia M. Jackman* as widow and legatee of the deceased, appealed to this court. The facts of the case are stated more fully in the opinion of the court.

The testimony preserved in the bill of exceptions is exceedingly voluminous, and as the chief parts of it, relied upon by the respective parties, are clearly stated in the two opinions, *infra*, no further statement will be made here.

*J. A. Sleeper, John R. Bennett, William H. Ebbetts* and *Cassoday & Merrill*, for the appellants.

*Matt. H. Carpenter, A. Hyatt Smith, John Winans* and *L. F. Patten*, for the respondent. ·

Cole, J. On the appeal from the decision of the county court admitting the will of Timothy Jackman to probate, the circuit court ordered the following issues to be tried by a jury, namely:

First. Did Timothy Jackman, in his life time, execute the paper-writing propounded as his last will and testament, bearing date September 18th, 1866; and did the witnesses whose names are thereto subscribed, attest and subscribe the same in the presence of said Timothy Jackman; and were they competent at the time they subscribed their names thereto?

Secondly. Was the said Timothy Jackman, when he executed the said paper-writing, dated September 18th, 1866, of sound mind?

Thirdly. Was said paper-writing so executed by the said Timothy Jackman with full knowledge of its provisions?

Fourthly. Was said Timothy Jackman induced to execute said paper-writing by any influence which deprived him of his free will?

Fifthly. Were the words and figures "September 18th, 1866," upon the top margin of the first page of said paper-writing, written thereupon after the same

was executed by the said Timothy Jackman, and if so, when and by whom?

Sixthly. After said paper-writing was executed by the said Timothy Jackman, did he, when of sound mind, of his own free will, execute another paper-writing purporting to be his last will and testament, and which was attested in his presence by two competent subscribing witnesses?

Upon the trial of these issues, a vast mass of testimony was introduced, a great portion of which seems to me entirely irrelevant and improper. But, on account of the conclusion I have reached upon the main question in the case, I shall not stop to consider the objections taken to the admission of this irrelevant testimony. The uncontroverted evidence bearing upon the first three issues was so clear and conclusive, that the court directed the jury to answer those issues in the affirmative. And the fifth and sixth issues the court likewise directed the jury to find in the negative, the evidence being equally clear and satisfactory, that no other answer could be given to them. The fourth issue the court submitted to the jury, after a charge as to what constituted in law undue influence. And this issue the jury found in favor of the contestant of the will, and that the testator was induced to execute the will by some influence which deprived him of free will. The proponents of the will moved upon the minutes of the judge to set aside the verdict and grant a new trial upon the fourth issue; and also, for a new trial upon all the issues, upon exceptions taken on the trial, and for insufficient evidence to support the verdict; which motions were overruled. The proponents then moved that the court allow and admit to probate the paper-writing propounded as the last will and testament of Timothy Jackman, notwithstanding the verdict of the jury; which motion was likewise denied.

Now the first question which presents itself in this

court is: What effect is to be given to the verdict of the jury on a trial of issues of this character? On the part of the contestant it is claimed, that the same effect must be given the verdict as in strictly common law actions, and that this court should not, on appeal, reverse the judgment merely because in its opinion the proof was not sufficient to sustain the verdict, if there is any evidence tending to sustain the finding of the jury. On the other side it is insisted, that on an appeal from the county to the circuit court, from an order admitting or refusing to admit a will to probate, the circuit court does not derive its authority or mode of proceeding from the common law; but that it derives its authority from the statute, which, in these matters, confers upon that court the powers of the ecclesiastical courts of England, and authorizes modes of proceeding strictly analogous to those of courts of chancery.

It seems to be quite well settled that courts of chancery formerly had no original jurisdiction over probate of wills, whether of real or personal estate. That jurisdiction was vested in the ecclesiastical courts, whose decree or sentence in respect to the validity or invalidity of the will was conclusive, so far as the personalty was concerned. But the probate was inoperative so far as the will related to real estate, the validity of the will in respect to it being solely cognizable by the courts of common law in the ordinary forms of suits. *Gaines v. Chew*, 2 How. (U. S.) 619–645; *Tompkins v. Tompkins*, 1 Story, 547; *Colton v. Ross*, 2 Paige, 396; *Olney v. Angell*, 5 R. I. 198; *Clarke v. Clarke*, 7 id. 45. In this country, however, the probate of wills, both of real and personal estate, is generally confided to courts of special jurisdiction, under the various names of the court of probate, county court, register's court, orphan's court, the court of the ordinary, and the surrogate's court (2 Kent, 410); and their modes of proceeding are very much regulated by

statute.    In this state the jurisdiction concerning the probate of wills and the administration and settlement of estates is vested in the county courts.    The decisions of those courts upon the question of the validity or invalidity of the will is conclusive, unless an appeal is taken therefrom.    Chapters 97 and 117 R. S.    By the latter chapter it is provided, that any person aggrieved by any order, sentence or judgment of the county court, may appeal therefrom to the circuit court of the same county.    Sec 24.    And upon the appeal being perfected, the circuit court is authorized to " proceed to the trial and determination of the question according to the rules of law ; and if there shall be any question of fact to be decided, issue may be joined thereon under the direction of the court, and a trial thereof had by a jury."    Sec. 28.    This is the only provision which prescribes the practice and mode of proceeding in this class of cases, in the circuit court, upon controverted questions of fact; and the inquiry arises, whether the course contemplated is not more analogous to that pursued in equity when a feigned issue is awarded, than to the practice of courts at the common law.    It seems to me that the modes of proceeding refer to those adopted by courts of chancery. It will be seen that the submission of questions of fact to a jury is subject to the discretion of the court.    The court may, if it sees fit, determine all questions of fact, as well as of law, without the intervention of a jury. It has full power to do so.    But if it wishes the aid of a jury in settling any question of fact to be decided, the statute authorizes it to send such issue to a jury for trial.    This is strictly analogous to the course pursued in courts of chancery, where a feigned issue is awarded under the direction of the chancellor.    And I am inclined to think that it was the intention of this statute to give the verdict of a jury upon questions of fact submitted, the same effect substantially that it had upon an issue out of a court of equity.    It is not to be

deemed conclusive and binding upon the judgment of the court, but the verdict may be set aside when it is unsatisfactory and against the weight of evidence, and the matter be again submitted to a jury on a new trial. This, it seems to me, is the practice contemplated by the statute. It is quite true that it requires the circuit court to " proceed to the trial and determination of the question " involved in the appeal, " according to the rules of law." But I do not think this language converts the appeal into a common law action, with the incidents appertaining to such an action. For if that were the intention of the statute, why did it provide that questions of fact might be submitted to a jury at the discretion of the court, instead of making it a matter of strict right to have them so tried as in a case at common law ?

It is very obvious that the order of the county court appealed from might be some decision or allowance in the account of an administrator or guardian ; or an order refusing or granting letters testamentary, or letters of administration or guardianship ; or a decision of any one of the numerous questions arising in probate proceedings. And in all these cases the circuit court proceeds and determines the matter " according to the rules of law," that is, in accordance with established legal and equitable principles, and agreeably to what is just and proper under the circumstances. And so, upon an appeal from an order of the county court admitting to probate a will, the circuit court must proceed and determine the matter according to settled principles applicable to the case; and if the assistance of the jury is desirable to determine doubtful questions of fact, it may have the verdict of a jury to inform its judgment and conscience. But when the verdict is unsatisfactory, and clearly against the weight of evidence upon the issue submitted, it is the duty of the court to set it aside and grant a new trial, where perhaps a court of law might not disturb it. This is the

practice upon feigned issues in chancery, the court granting a second, sometimes a third, fourth, and even fifth trial, where a court of law would not interfere or disturb the first verdict. *Patterson v. Ackerson*, 1 Edw. Ch. 96; *Winchilsea v. Wanchape*, 3 Russell, 441. .

On the argument, the counsel for the proponents of the will cited, to the point we are considering, the case of *Clapp v. Fullerton*, 34 N. Y. 190. That was an appeal from a judgment of the supreme court, affirming a decision of the surrogate admitting to probate a last will. PORTER, J., in delivering the opinion of the court, says: "On appeals from the decrees of surrogates, the supreme court succeeds to the jurisdiction and authority of the old court of chancery. The review is in the nature of a rehearing in equity, and the admission of improper evidence, on the original hearing, furnishes no ground for reversing the final judgment, if the facts established by legal and competent testimony are plainly sufficient to uphold it." p. 195. The difference between the New York statute in respect to appeals from the decisions of the surrogate, and our own upon this subject, makes this decision less applicable than another case which has come under my observation. (See 3 vol. N. Y. Statutes, 5th ed. by Banks & Bro. p. 151.) The case of *Withee v. Rowe*, 45 Maine, 571, is more nearly in point, as the statute of that state is quite similar to ours. (R. S. Maine, 1857, p. 406, chap. 63, § 24.) In that case, TENNEY, C. J., says: "It is provided in R. S. of 1857, ch. 63, § 24, that in appeals from the judge of probate to this court, if, upon a hearing, any question of fact occurs proper for a trial by a jury, an issue may be formed for that purpose under the direction of the court, and so tried. This course is analogous to that pursued in equity courts, where a feigned issue is prepared under the direction of the chancellor, or other person who exercises his authority." See also *Shailer v. Bumstead*, 99 Mass. 112–131. In view of these authorities, and the provision

of the statute, I therefore conclude that the position of the counsel for the contestant, that this court should not reverse the judgment and order a new trial if there is any evidence tending to sustain the verdict on the fourth issue, is clearly untenable.  For the question here is, not whether a court of law, in a strictly common law action, would or would not grant a new trial, but whether in this case the verdict is not against the decided preponderance of evidence in finding that the will was obtained by undue influence.  And a majority of the court are decidedly of the opinion that it is, and that the verdict can have no such conclusive effect upon that question as has been claimed for it by the counsel for the contestant.

It is conceded that the will was executed in conformity to the statute—that Mr. Jackman was of a sound disposing mind and memory when he made it, and had full knowledge of all its provisions.  The evidence upon these points is so clear, positive and overwhelming as to remove all doubt or controversy.  The only ground, then, for impeaching the will, is that it was procured by undue influence.  The burden of showing that undue influence, within the meaning of the law, was exercised over the testator when he executed the will, is upon the contestant.  It cannot be presumed from conjecture or suspicion, without reasonable and satisfactory proof of facts which establish the contrivance and undue influence.

An experienced judge, as well as confessedly a learned and discriminating text writer upon wills, states the following propositions as the result of adjudged cases as to what influence must be exerted over the testator to avoid the will:

1. That it must be such an influence as to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than of his own.

2. It must be an influence specially directed towards

the object of procuring a will in favor of particular parties.

3. If any degree of free agency or capacity remained in the testator, so that, when left to himself, he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty; and it must have proved successful, to some extent, certainly.    1 Redfield on Wills, 524.

These rules are cited with approbation by DAVIES, J., in delivering the opinion of the court of appeals in *Gardiner v. Gardiner*, 34 N. Y. 155–161.

" The amount of undue influence which will be sufficient to invalidate a will, must, of course, vary with the strength or weakness of the mind of the testator. The influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired; but in any case the influence that will vitiate a will must be such as in some degree to destroy the free agency of the testator, and constrain him to do what is against his will, but what he is unable to refuse or too weak to resist." 1 Jarman on Wills, 36.   " But * * * the influence, to vitiate an act, must amount to force and coercion, destroying free agency; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; farther, there must be proof that the act was obtained by this coercion, by importunity which could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear." Id. p. 39.   "A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control.   That degree, therefore, of importunity or undue influence,

which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it." BUCHANAN, C. J., in *Davis v. Calvert*, 5 G. & J. 270, 302 "Undue influence, legally speaking, must be such as in some measure destroys the free agency of the testator; it must be sufficient to prevent the exercise of that discretion which the law requires in relation to every testamentary disposition. It is not enough that the testator is dissuaded, by solicitations or argument, from disposing of his property as he had previously intended; he may yield to the persuasions of affection or attachment, and allow their sway to be exerted over his mind; and in neither of these cases would the law regard the influence as undue. To amount to this, it must be equivalent to moral coercion; it must constrain its subject to do what is against his will, but which, from fear, the desire of peace, or some other feeling, he is unable to resist; and when this is so, the act which is the result of that influence, is vitiated." *Gilbert v. Gilbert*, 22 Ala. 529–532, by GOLDTHWAITE, J. This language is quoted and approved in *Taylor v. Kelly*, 31 Ala. 59–70. These are but a very few of the many authorities which might be quoted as to what constitutes undue influence within the meaning of the law. "In regard to undue influence," says Judge REDFIELD, "which is a species of fraud, the cases are almost infinite in number and variety." 1 Red. on Wills, ch. 10, § 38, p. 514. And the correctness of this remark will certainly be confirmed by a reference to the cases cited by the learned author in the notes to § 38.

But it is probably unnecessary to cite further authorities as to the degree of influence which the law condemns as being "undue" and "improper," and which, when found to have been exerted, will invalidate a will. It is sufficient to observe that they generally agree in saying that the influence must be such as in some

degree to destroy the free agency of the testator, and *constrain him to do what is really against his will, so as to virtually render the testamentary act the will of another rather than his own.*    But the influence of a wife or child, if exerted in a fair and reasonable manner, is not unlawful; and in order to be "undue," " it must be exerted *mala fide,* to produce a result which the party, as a reasonable person, was bound to know was unreasonable and unjust; and it must have the effect of producing illusion or confusion in the mind of the testator, so as either to overcome his free agency or power of judging upon the true relations between himself and those who might be supposed to have just claims upon his bounty." 1 Red. on Wills, p. 527; *Small v. Small,* 4 Greenl. 220; *Dean v. Negley,* 41 Pa. St. 312; *Woodward v. James,* 3 Strobh. Law, 552.

Now, keeping in mind these definitions as to what amounts in law to undue influence, we will proceed to consider the question whether the evidence is sufficient to warrant the finding of the jury upon the fourth issue. It is claimed in argument, that Timothy Jackman was induced to make this will by the controlling influence of his wife, *Marcia M. Jackman,* and that really he was not a free agent when he made it, the will being her act rather than the act of himself.    The counsel for the contestant relies upon a number of facts and circumstances disclosed in the proofs in support of this position, the more material of which will only be noticed.

In the first place, let us consider the argument founded upon the provisions of the will itself.    It appears that the testator had been twice married ; that by his first wife he had six children, four of whom arrived at maturity and survived him; and that he had three children by his second wife who survived him. After his second marriage, in New York, and some twenty-five years before his death, Timothy Jackman removed with his family to Janesville, where he after-

wards resided. At this time he had but three thousand dollars, including the one thousand dollars he received from his wife. He engaged largely in various kinds of business at Janesville—farming, milling, merchandising and banking—and had accumulated, at the time of his death, an estate valued from $140,000 to $150,000. The great bulk of this property he bequeathed to his wife. He did not discriminate in his will very greatly between the children by his first and second wife. He gave no one of them over $5,000, and the entire amount bequeathed them was not more than about a seventh part of his estate. Now it is said that this disposition of the testator's property was unjust and unnatural, inconsistent with the parental duties, and with the claims which the children, especially those by the first wife, had upon him. It is certainly true that the will is not such a one as we might have supposed the testator would make. The mind is unconsciously inclined against the will, because it does not give Nathaniel, Hiram and Mrs. Lappin such a portion of the testator's estate as they would seem to have the right to expect. The claims of these children upon their father's bounty were strong and real. They labored faithfully for their father until majority, and even after that period, and it was doubtless by the united efforts of all members of the family who were of age to work, that Mr. Jackman first began rapidly to acquire his fortune. And it does not appear that he ever made sufficient advances to all of them to compensate for the years of toil they spent in his service. He remembered them in his will, but he only gave Hiram and Mrs. Lappin $1,000 each. This is surely not as liberal a provision as they might reasonably have expected from his property. But still we must not forget that the law recognizes the right in every person of proper age to dispose of his property by will as he may think best. This principle is at the very foundation of our law and polity. The testator "may do what he

will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust." PORTER, J., in *Clapp v. Fullerton*, 197. The law has certainly not intrusted the courts with the power of making a will for Timothy Jackman or any other person. They cannot, therefore, set his will aside on account of any real or apparent inequality in its provisions, unless upon some legal ground.

Nor can we infer that Mrs. Jackman exerted such an influence over her husband, either by her importunity, mental superiority, domestic tyranny, or force of character, as to deprive him of his freedom of will, and thus render his testamentary act more the offspring of her will than his own, merely because he gave her the great bulk of his property. We must have some distinct and satisfactory proof that she exerted over him an influence which the law condemns as unlawful and improper, in order to avoid the will. It is consequently not enough to destroy the will to show that it was very advantageous to Mrs. Jackman, and greatly in her favor. For all this might have arisen from the fact that the testator entertained a high personal regard and affection for his wife, and attached a great value to her services and advice, because " she had always been," as he declared to several witnesses, " a good wife, and had always done her part " in the accumulation of his property and the care of his domestic affairs.

Indeed, there is really no proof anywhere in the case, that Mrs. Jackman ever obtained over her husband an influence which was unreasonable and excessive, and which he could not at all times effectually resist. It is true, the witnesses state that Mrs. Jackman was a " woman of very strong mind, strong purpose, pretty tenacious of her opinion, very resolute and determined;" yet it does not appear that she was

able so to control Mr. Jackman as to make him do what he did not wish, or could carry any point with him where she ought not to prevail. And the authorities agree that "lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it; and there can be no presumption of its actual unlawful exercise merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions." *Dean v. Negley; Small v. Small.*

Another point relied on to show that Mrs. Jackman exerted an unlawful influence over her husband, is the fact that for several years prior to the time of making the will, the testator had frequently discussed with his neighbors and friends the propriety of making a will, and had uniformly declared that he would never make one. It certainly appears, by the most ample proof, that the testator said, in these discussions, that he should know no difference when "he got through with his property,"—"that the law might decide the matter,"—"that the law would dispose of his property better than he could himself,"—"that he was opposed to the policy of making wills,"—"that his property might go to his heirs according to law,"—and other like expressions. This was before he was taken sick in June, 1866. After that, he changed his mind upon the subject, and made two wills. What produced this change in his views in regard to the propriety of making a will, the evidence does not disclose, and it would be idle to speculate upon the subject. Perhaps it was the suggestions of his intimate friend Rogers, who advised him to make a will and to settle up all his matters and put them in shape so that they would explain themselves without difficulty. Perhaps it was a consider-

ation of the habits of John and Frederick, and an apprehension that if they should inherit their share of his property, they would squander it in vice and dissipation.   Perhaps it was the consciousness that an incurable disease was fastened upon him, which would sooner or later produce death.   It is not an unfrequent occurrence that the views of men, in a situation so solemn, undergo a great change upon the most important subjects, without the influence of any one.    But whether it was the operation of any or all of these considerations upon his mind, or the promptings of the esteem and affection he seems to have entertained for his wife, that caused him to make a will, we can never know.   Certain it is, that his views in regard to the policy of making a will, underwent a change, and there is no warrant for assuming that this change was produced by the undue influence or overruling importunity of his wife.

In the spring or summer of 1866, the testator was taken sick with diabetes.   At this time he was about sixty-five years of age.   He had up to that time generally enjoyed fine health and great vigor of constitution.   He always possessed a great flow of animal spirits, was cheerful and genial in his disposition, and was a man of strong purposes and decided force of character, not likely to be controlled or tyrannized over by any one.   When he became sick of diabetes, his cheerfulness in a great measure left him ; he thereafter had less vigor of intellect, was considerably enfeebled in body and mind by the disease, and for some weeks after the first attack he was pretty much confined to his house, and was unable to attend to business.   His health, however, improved some during the latter part of the summer of 1866, and he was again able to be about town attending to and managing his estate, though he never became the active, strong business man he had once been.   I conclude that his health must have been much more firm in

In the mat'er of the probate of the will of Timothy Jackman—First appeal.

the year 1867 than it had been during the previous summer. In June, 1868, he went east with his wife to visit his relations and friends, doubtless hoping that the trip might do him good, but finally died of his original disease, at his brother's, in Vermont, in August, 1868. During all his sickness, it is conceded that his wife was constant and unwearied in her care and attentions to him.

Now, it is claimed by the counsel for the contestant, that while Mr. Jackman was thus confined to his house by sickness, enfeebled in mind and body by disease, he was so subject to the constant control and influence of his wife, and the influence of other members of his family, relatives of hers, and wholly in her interest, as that his free agency was finally overcome, and he was induced to make the first will, by which he gave her nearly six-sevenths of his estate upon condition that she did not again marry, and that she paid John one hundred dollars annually during his natural life; and then he was induced by this same controlling influence, which he was unable to resist, to change that will and make the one propounded for probate, in which these conditions are omitted. But it seems to me to be a sufficient answer to this argument to say, that it is impossible to find in all the testimony any reasonable and satisfactory proof upon which to base the conclusion that Mrs. Jackman, or any person, at this time acquired such a dominion over Mr. Jackman as to destroy his free agency and his disposing power of mind.

*Mr. Bates*, the friend and legal adviser of Mr. Jackman, states fully the circumstances under which both these wills were made. He drew them both, and received his directions for drawing the first will from Mr. Jackman himself, at his house. After the execution of that will by the testator at *Bates'* office, Mr. Jackman informed him that he wanted to change the will in one or two particulars. In that conversation,

*Mr. Bates* says that he suggested to Mr. Jackman that, by giving the property to his wife, contingent upon her not marrying again, he tied it up so that *Mrs. Jackman* could not dispose of any portion of it if she should want to sell it. To this suggestion Mr. Jackman replied, that upon reflection he did not care whether that condition was in the will or not, and directed *Bates* to draw a new will, leaving out that condition, and also the one about paying the $100 annuity to John, because he believed the farm was sufficient, with ordinary industry, to support John, and that the latter had better not have this annuity. Now, I see no reason for discrediting this clear and positive testimony of *Mr. Bates.* If it is to be believed, it satisfactorily shows that Mr. Jackman was not unlawfully influenced by any one to make these wills, and that they expressed the wishes of the testator. It is true, all the medical testimony taken on the trial tends to prove that diabetes generally occasions great suffering to the patient; that it prostrates in an unusual degree the body and mind of the sufferer, " and renders him an easy prey to the influences of those about him." But we shall look in vain, through this case, for any satisfactory evidence that this disease did actually so prostrate and overcome Mr. Jackman that he was incapable of asserting his own will, but became so weak in his mind, and so facile in his purposes, as to " yield to the suggestions, opinions and entreaties of others," and bestow his estate upon those he did not wish should enjoy it. For, though it is undeniably true that Mr. Jackman, after he was attacked by diabetes, never was the same cheerful, determined, resolute and active man he had been, yet he was not an imbecile, a man under the control and dominion of any one. He maintained his personal independence, his individual character. He continued, to the day of his death, president of the Rock County National Bank; he " managed with great prudence and economy his own private fortune, so that it was con-

stantly accumulating on his hands." Not a witness pretends that he ever saw him when he was not in the possession of his intellectual powers, did not understand all that was said to him, and did not fully comprehend the relation of things. It does not appear that he ever uttered a foolish expression, or was guilty of any extravagant conduct. His mind was clear upon all business matters. Crosby, the cashier of the bank, says, that though weak physically, yet he "never saw anything but what his mind was clear." Folio 702. This witness added, that on one occasion after the testator's sickness, he consulted Jackman, then at the bank, about some business matter, and saw that he (Jackman) was rather inclined not to give his opinion about it. He told Crosby that he would "rather let him fix it up to suit himself." Still, it appears that after this Jackman was consulted about the business transactions of the bank. He was consulted about several loans of magnitude made by the bank in 1867, and all along the witnesses generally agree that his mind was clear and his mental faculties not perceptibly impaired. His partner, Shubael W. Smith, a shrewd, careful, experienced business man, had sufficient confidence in his capacity and judgment to permit him to make sale of the mill which they owned together. The mill was sold in January, 1867, for $40,000. Mr. Alden, the purchaser, says that Mr. Jackman was the one who told him there were some reservations in regard to the right of way connected with the property; that Jackman explained what these conditions were, and transacted most of the business. And this witness also says, that he saw Mr. Jackman frequently after his attack of diabetes, and that he could see no difference in his mind between what he was after and before this sickness; Jackman, he says, "always had a way and will of his own." And to the same effect is the great weight of testimony. Now of a man whose mind was so clear, whose intellectual powers were so vigorous,

who always seemed to have "a way and will of his own," we are asked to hold, almost upon suspicion and conjecture, certainly without any satisfactory proof to sustain the presumption, that Mrs. Jackman, during three or four months' care in sickness, obtained such a degree of command and influence over him as to actually destroy his free agency in so important matter as disposing of his property by a last will. I think we have no right to so hold upon the evidence.

Further, some declarations of the testator, made after the execution of the will, are relied on to show that it was procured by undue influence. These declarations are: that the testator said on one occasion to the witness Wooliscroft, that he "had made a will for the sake of peace, but he intended to tear it up or destroy it." Again, that he said to Patten, when *Hiram* was negotiating for the Matteson mill, that he would aid *Hiram* in making his payments when they became due; that he would have it put in his will, so that *Hiram* would have the means to make these payments, adding, "My will never was as I wanted it." No rule of evidence is better settled than this: that all such verbal admissions and declarations are to be received with great caution. They are entitled to no very great weight, on account of the extreme liability of the witness misunderstanding the declaration, or the party himself making the declaration not clearly expressing his own meaning. 1 Greenl. Ev. § 200. But I have this further remark to make about these declarations: If Mr. Jackman made the will for the sake of peace, and intended to destroy it, why did he not carry out that intention? The will was in the possession of his friend, *Mr. Bates,* and Mr. Jackman had but to step to *Bates'* office, procure his will, and destroy it, if he wished to do so. And if he was dissatisfied with his will, as his declaration to Patten would indicate, why did he not change it? He was among his neighbors and friends. He was attending

to important business matters at this time. It is idle to say that Mr. Jackman had not sufficient understanding and ability to change or revoke his will at this time, if it was " not as he wanted it." Why did he not go to the office of any one of the honorable legal gentlemen connected with this case, to say nothing of other lawyers living in Janesville, and have a will drawn which would make such a disposition of his property as he wished? This was in the spring of 1867 that this declaration was made, according to Patten's testimony, and he did not leave home for the east until twelve or fourteen months afterwards. And during all that time he was about the city, attending to his duties as president of the bank, managing with prudence and success his own important business matters, and yet he took no step to change the provisions of the will, which never was as he wanted it. Assume for the moment that the testator made that will in the first instance, through constraint, for the purpose of securing domestic peace and quiet, and in obedience to the controlling and excessive importunity of a self-willed and tyrannical woman. Yet nothing is more manifest than the fact that after his health improved, and he was about attending to business, he had ample time and abundant opportunity to revoke or change his will. He had sufficient knowledge and experience to know that he had but to step into the office of any honorable lawyer in his city and have this done, and that the matter would be treated as confidential and strictly professional by his legal adviser. Why did he not do this if his will did not dispose of his property according to his wishes? No satisfactory explanation of his conduct has been given, why he did not, after he was relieved from the alleged dominion of his wife, change or destroy the will, if it was really true that the will was not as he wanted it.

Moreover, there were declarations of the testator adduced in support of the will. Brace testifies that

the last time he saw him, when about starting for the east, he remarked to him that "we should never see him again." "Well," said the testator, "my property is all fixed." Storey says that he said to him, the day before he left, in reply to a suggestion that it was barely possible that he might not come back: "My business is all arranged satisfactorily, even if I should not come back." In the conversation, too, that he had with Conrad about the will, it is evident the testator knew he had made a most liberal provision for his wife, and that his reason for bestowing upon her such a large portion of his estate, was because "she had been a good wife, and had done her part in accumulating the property." But not to dwell further upon the declarations of the testator, I will say that the only legitimate inference which I think can be drawn from them and his conduct is, that he made the will understandingly and advisedly, and was satisfied with the disposition of his property made by it.

There are some other matters in this case which are relied on by the counsel for the contestant, to show that Mr. Jackman's mind had become greatly impaired by his sickness, and that he made the will in consequence of constraint and unlawful influence exercised over him by his wife. I shall not, however, notice them, because they are really entitled to no consideration. Nor is it necessary to further allude to the evidence adduced in support of the validity of the will.

This opinion already far exceeds the limits intended. And I therefore close it by saying, that the conclusion which a majority of the court has reached upon the whole case is, that the finding of the jury upon the fourth issue is so clearly unsupported by the evidence, that it ought not to stand.

We almost feel like quoting, as an appropriate final remark upon the case, the close of the opinion in *Farr v. Thompson, supra*, " that to allow this verdict to stand would be to let the jury run wild under the influence

of prejudices and feelings, which, however honorable and praiseworthy, must not be permitted to overthrow the rules of law, or divert the current of justice." It is true, in this case, the object of the testator's bounty was a wife, an estimable woman, so far as we can determine her character from the evidence; one with whom he seemed to have lived for more than twenty-five years in sympathy and true affection.

It follows from these views, that the judgment of the circuit court in the case must be reversed, and the cause remanded for a new trial of the issues.

PAINE, J. The majority of the court has decided that the judgment of the circuit court, declaring the invalidity of the will, must be reversed for the reason that the court below erred in not granting the motion for a new trial upon the ground that the verdict was against evidence. I cannot concur in this result. Whether it could be sustained in any event, must depend materially upon the effect that should be given to the verdict of a jury on the trial of questions of fact in actions of this character, at the circuit, on appeal from the probate courts. If such verdicts are entitled to the same effect as verdicts in actions at law, then it is the settled rule in this court that where the court below has refused to grant a motion for a new trial made upon the ground that the verdict was against evidence, this court will not interfere if there is any evidence that, by any legitimate construction which the jury might place upon it, sustains the verdict. But, on the other hand, if these verdicts are entitled only to the same effect as verdicts upon a feigned issue in chancery, then it is conceded that not only the court below, but this court on appeal, has a much larger discretion and power in respect to setting them aside and deciding upon the questions of fact without regard to them, than either would have in actions at law. We have even held that this power of determining the fact

as well as the law in purely equitable actions, was such an inherent part of the equity jurisdiction vested by the constitution in the courts, that the legislature cannot deprive them of it.    *Callanan v. Judd et al.*, 23 Wis. 343.

The statute merely provides that on appeals from the probate to the circuit courts, questions of fact may be tried by a jury.    It makes no provision as to the effect of the verdict.    It would seem, therefore, that its effect should depend on the character of the action or proceeding itself.    If the subject-matter was one within the settled jurisdiction of courts of equity, it would not only be in accordance with the principle of the case just referred to, but also with what might reasonably be assumed to have been the intention of the legislature, to say that the verdict should have the same effect as verdicts upon questions of fact usually have in equitable actions.    But if the subject-matter, instead of being one of equitable cognizance, was one that had always been determined by a trial at law, then it would be equally reasonable to suppose that the intention of the statute was that the verdict should have the same effect that verdicts have in legal actions.

If this is a fair test, the verdict here would fall within the class of verdicts in actions at law.    The subject-matter of the proceeding was the probate of a will.    Although questions respecting the validity of wills often come incidentally before courts of equity, in the exercise of their general jurisdiction over trusts, frauds and fiduciary relations, yet that the mere probate of wills has never been any part of their jurisdiction, either in England or this country, the following cases show :    *Townsend v. Townsend*, 4 Coldwell (Tenn ), 70 ; *Olney v. Angell*, 5 R. I. 198 ; *Clarke v. Clarke*, 7 id. 45 ; *Hamberlin v. Terry*, 7 How. (Miss.) 143 ; *Tompkins v. Tompkins*, 1 Story, 547 ; *Colton v. Ross*, 2 Paige, 396 ; *Van Alst v. Hunter*, 5 Johns. Ch. 148.    In *Van Alst v. Hunter*, Chancellor KENT said : " The heir has no right

to come here, as of course, and have an issue substituted in the place of an ejectment, for a court of equity is not the proper jurisdiction to try the validity of a will. When an issue has been directed, on the bill of the heir at law, it has been, according to what was said by the Master of the Rolls in *Jones v. Jones* (3 Merivale, 161), in cases where no opposition has been made to that mode of proceeding. *It has been understood to be settled, since the case of Kerrick v. Bransby* (3 Bro. P. C. 358), *decided on appeal in* 1727, *that the validity of a will must be determined on a trial at law."*

As this has been so long settled, when a question of fact on which the validity of a will depends has been tried by a jury under our statute, I think their verdict should have the same effect as verdicts in actions at law. Not being able to deprive it of that effect upon the ground that the subject was of equitable jurisdiction, and therefore within the principle of *Callanan v. Judd,* I know of no other ground upon which the court can give it any other or less effect than it gives to verdicts in other actions of purely legal cognizance. So far as I have found any authorities directly bearing upon the question, they support this conclusion. In *Tillman v. Hatcher,* Rice (S. C.), 271, where a jury found against the validity of a will upon the ground, among others, of undue influence, although the judge before whom the trial was had did not think the evidence of undue influence sufficient to defeat the will, yet a new trial was refused. The court said: " But both of these questions were submitted to the proper tribunal for the decision of facts, with full instructions upon the legal meaning of a sound mind, memory and discretion in testators; and the jury have, by their verdict, annulled the will. It was within their peculiar province and jurisdiction so to do." And again, at the close of the opinion: " Upon the whole, the court is constrained to follow the common rule, that where the case consists of facts which have been fairly submitted to a jury,

with full instructions from the court, their verdict concludes the case."

In *Thompson v. Farr*, 1 Spear, 93, the same rule was re-asserted. On page 101, the court says : " But when the law has been properly expounded, verdicts upon facts in cases of wills are to be regarded as like verdicts in other cases, and must be left undisturbed where there is conflicting testimony, although it may appear to this court, unacquainted with the witnesses, and having only a summary statement in writing of the evidence, instead of the full hearing of the *ore tenus* examinations, that a different conclusion should have been attained."

In *Kelly v. Miller*, 39 Miss. 17, which also involved a question of undue influence, the court said : " These are questions of fact submitted to the investigation of the jury in the court below, in contemplation of law, upon a full and fair examination of all the witnesses on both sides. Upon principles well settled in this court, their verdict will not be disturbed here, unless it is manifest, from the whole record, that it was clearly wrong, or unless misdirection of the court or other error apparent on the face of the record may have tended to produce such verdict." And again they say : " The most that can be said on the part of the appellants in relation to the testimony is, that it is conflicting, and in such cases it is the peculiar province of the jury to weigh the evidence, and give credit to those facts and circumstances which, in their judgment, are entitled to the greatest consideration. The law has wisely imposed this delicate and responsible duty on jurors, and it is not for courts (in such cases) to rejudge their judgment."

It seems that in New York, under the special provisions of their statutes, their court having succeeded to the appellate power of the old court of chancery, the trial of an appeal from the surrogate is in the nature of a rehearing in equity. See *Clapp v. Fullerton*, 34 N.

Y. 190. And they do not seem to try questions of fact by a jury; but they are sometimes tried before a referee. And in the case of *Voorhees v. Voorhees*, 39 N. Y. 463, where a question of undue influence had been so tried, the court of appeals say: "To say the least, there was some evidence of undue influence; consequently we cannot disturb the finding of the referee on this subject." Under our statute there is no ground for saying that these appeals are in the nature of a rehearing in equity. And as it provides expressly for a trial by jury on questions of fact, it would seem that their verdict ought at least to be entitled to as much effect as a finding of a referee under the statute of New York.

I have thus considered this preliminary question at some length, for I regard it as a very important one, not so much on account of its result in this particular case, as of its bearing upon actions of this character in general. The value of the jury trial, and its peculiar adaptation to the determination of questions of fact, are proverbial in the law. So also are the superior opportunities of the jury and court below, who see and in most cases know the witnesses, to arrive at correct results upon matters of fact, over those of an appellate court that neither sees nor knows them, but judges only from a printed report of their testimony. This was very clearly pointed out in the opinion of the Chief Justice in *Snyder v. Wright*, 13 Wis. 689.

It may be observed, also, that the tendency of the later cases is to give greater force and efficacy to verdicts upon feigned issues in chancery, than was formerly done. See *Clarke v. Congregational Society*, 45 N. H. 331, where it was held that in such a case the court would ordinarily be governed by the same rule as on a motion for a new trial in an action at law.

Upon these grounds it seems to me that for this court to give any less effect to this verdict than it would give to a verdict in any other legal action, is to so far im-

pair and defeat a statutory right of the party; that it is an assumption of power on our part that can be justified neither upon authority nor upon any considerations of policy.

Having arrived at this conclusion, the only remaining question necessary for me to consider is, whether there was any evidence which, by any construction which the jury were at liberty to place upon it, would sustain the verdict. I do not understand the majority of the court to hold that there was not, and certainly it would seem impossible to maintain such a proposition.

Before proceeding, however, to any consideration of the evidence, it will be proper to refer to some incidental questions, the dispositions of which will materially direct and aid the principal inquiry.

The judge below very properly took from the jury the issue as to the disposing capacity of the testator. That notwithstanding his health was somewhat broken by his disease, and perhaps by approaching age, he still had such capacity, was clear from all the evidence, and a verdict to the contrary ought not to have been sustained. The only question submitted, and therefore the only one with reference to which the testimony is to be considered, was that of undue influence.

Upon this question, from its very nature, the evidence necessarily takes a wide range. Everything that tends to reveal the real character of the individual, his feelings, his thoughts, his passions, his prejudices, loves and hates, his convictions, his strength and his weaknesses, may aid in its solution. The testimony, therefore, often gives a very full history of the party and his family, and those who surround him. Such was the case here. But the only important question as to the admissibility of evidence arises in respect to the declarations of the testator, at different periods of his life, as to his general feelings and views

on the subject of making a will, and his declarations as to his feelings in respect to this will, both before and subsequent to its execution. I think all these declarations are clearly admissible, both upon principle and authority. The nature of the inquiry makes them so. The fact to be ascertained is the actual condition of the party's mind and feelings. Wherever this is the inquiry, what he says upon the subject, at any time to which the inquiry relates, is in all cases original evidence. His general views and feelings in regard to making any will at all are material, because they tend in some degree to show, if he actually makes one, whether it was done voluntarily or at the instigation of others. His feelings in respect to the particular will in question are too obviously material and important to justify comment. And that they may be proved by his declarations subsequent to its execution, as well as those made at the time, is, I think, also apparent. It is not like the declarations of a party affecting a title acquired through him, made after he had parted with the title. The testator never parts with his title until his death. Until then his will does not take effect. It is ambulatory, and the whole matter entirely subject to his control. It is this peculiarity in the nature of the instrument which distinguishes it from all others, and makes the feelings of the testator in regard to it, even up to the last hour of his life, material to be considered, and provable by his declarations as original evidence.

It may well be that if the party, in connection with such declarations as to his own feelings, should also state particular facts respecting the actions of others, no matter how material if true, still as to such facts his statements would be mere hearsay, and inadmissible. But the subsequent declarations proved in this case were such only as related directly to the feelings and mental condition of the testator himself, and as such were proper evidence. This conclusion is fully

supported by the authorities cited upon this point by the respondents' counsel.

So also it is necessary to define what is undue influence in order to know what we are to look for in the evidence.    There are many strong expressions in the books to the effect that undue influence is such as destroys the party's free agency.    And it seemed to be assumed by some of the counsel for the appellants, that inasmuch as the testator himself gave the directions to his attorney for preparation of the will, and went alone to his office and executed it, apparently in a voluntary manner and without any immediate external compulsion,. therefore there could have been no undue influence in a legal sense.    I do not so understand the rule.    The law upon this subject does not take cognizance merely of those grosser influences which result from immediate external force and violence ·used or threatened.    It recognizes, also, those subtler influences which, without any external force or violence whatever, can, by means well adapted to the end, sometimes so control and overmaster the human will as to dictate to it acts entirely repugnant to the party's real feelings and wishes.    And it is obvious that influences of this character, sufficiently potent to control the party in respect to the substantial provisions of his will, might also be sufficient to compel him to go through the mechanical process of giving directions for it, and executing it in an apparently free and voluntary manner.    So that, while these circumstances may be very material to be considered, yet they are never of controlling force against the existence of undue influence.    The cases of *Voorhees v. Voorhees*, above cited, and *Tyler v. Gardiner*, 35 N. Y. 559, 595, 596, are direct authorities upon this point.

So, too, it was urged that there was no proof of any interference whatever by *Mrs. Jackman* to procure the execution of the will, .Without considering, now,

In the matter of the probate of the will of Timothy Jackman—First appeal.

whether such a claim could be sustained, it is sufficient to say that the improbability of procuring direct proof of the active exertion of the undue influence, in this class of cases, is one of their established features, and the courts have wisely held that it is not indispensable. In the case last cited, on page 594, the court said: "It is not to be supposed that fraud and undue influence are ordinarily susceptible of direct proof. Subscribing witnesses are called to attest the execution of wills, but not the antecedent agencies by which they are procured. The purposes to be served are such as court privacy rather than publicity. 'In some cases,' as this court said in *Sears v. Shafer*, 'undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction and the exercise of occasional or habitual influence.' (2 Seld. 272.)"

Having thus stated my views upon these preliminary points, I will refer, as briefly as may be, to some of the general features of the evidence which I think justify this verdict.

In the first place, it is well established that the testator, all through his life, down almost to the very time of executing this will, had a firm, settled feeling and conviction against making any will at all. This did not arise from any mere repugnance to the contemplation of his own death, and the propriety of making a disposition of his property in view of that event, but it arose, as the testimony abundantly shows, from a clear conviction that the law would make a just and proper disposition of his estate, and one with which he should be entirely satisfied. It was also shown, I think, beyond any question, that he was a man of strong natural affections, and that they were shared equally by all his children to the last. The fact that some of them were dissipated, and that he had some trouble on that account, gave occasion, from time to time, for him to remark upon the effect

of that upon his feelings towards them. · And it is a fact equally honorable to him and to human nature itself, that the true tenderness of a father towards his prodigal son always remained with him, and he repeatedly expressed his intention to treat them all alike at last, as he did through life.  After a life of remarkable health and physical vigor, in his old age he was attacked by a disease which, while it is entirely clear that it did not so impair his mental faculties as to deprive him of the capacity to make a valid will, yet, it is equally clear, did bring upon him that sense of feebleness and dependence, of approaching dissolution and decay, that general unnerving of the mental and physical powers, that age and sickness generally bring.   There can be no doubt that there was also produced the natural and usual result of an increased tendency to yield himself up to the direction of others, especially of those upon whom he felt himself in a measure dependent, and who enjoyed his confidence and affection.  His interest in the affairs of earth was doubtless diminished and deadened, while his aversion to effort, to struggle or collision, was correspondingly increased.   Such a condition is peculiarly exposed to undue influence, because both the inclination and the power to resist have in a measure failed. In this condition he executed this will, by which, after giving less than ten thousand dollars to the four children of his first wife, and about the same amount to his other children, he gave the entire remainder of a fortune estimated at about $140,000, to his wife herself.  Certainly it may be truly said, in the language of some of the cases, that here was an extraordinary "revolution in the testamentary intentions" of the party.  For, although that language has been usually applied to cases involving the validity of some will or codicil strongly contrary to some former will executed by the party, I think it equally applicable here, where it is already proved that the testa-

tor, instead of having made a former will contrary to this, had a fixed resolve to make no will at all, because he preferred the disposition of his property which the law would make.  A resolution to make no will, based upon that reason, indicated his testamentary intention as clearly as a will could have done.

The great weight which such a radical change of testamentary purpose has in raising a presumption of undue influence, if not accounted for upon some other reasonable grounds, is fully illustrated by the case of *Tyler v. Gardiner, supra,* and the cases there referred to. If we look to this testimony to find any other mode of accounting reasonably for this change of intention in Mr. Jackman, we shall look in vain.  The full force of the presumption arising from the great change of purpose, and " the improbability of the disposition " made by the will, to use the language of Sir JOHN NICHOLL in *Marsh v. Tyrrell,* cited in *Tyler v. Gardiner,* remains unimpaired.  So that it would seem to be almost, if not quite, one of those cases in which, as the New York court of appeals said, " undue influence will be inferred from the nature of the transaction alone."   But, in addition to the unabated force of this presumption, we have the express declaration of Mr. Jackman himself, that this will was never what he wanted it.

I pass over the testimony of Mrs. Barnes, who swears that at about the time when this will was made, she saw Mr. Jackman at his house ; that he was weeping ; and that, in answer to her inquiry what the matter was, he said that " his wife had gone away, and he supposed they were making his will ; that he loved his children all alike, and wanted them to fare alike, but that the old lady did not wish they should do so."  I pass over the testimony of Wooliscroft, that Mr. Jackman said that although he had made a will, " he intended to destroy it ; and that he had made it for the sake of peace."

It is said that Mrs. Barnes was the mother of the contestant's wife, and that she is contradicted in some particulars by the testimony of *Mrs. Jackman*. Neither of these circumstances is sufficient necessarily to discredit her, and the question of credibility was a proper one for the jury. I do not think she is contradicted by that evidence which shows that *Mrs. Jackman* was not present at the making of the will, and by the fact that the will could not be made without Mr. Jackman's presence. His language that "he supposed they were making his will," might naturally have been used by him with reference to some conference or consultation which he understood was being had upon the subject, prior to the actual execution. Wooliscroft may have been a liquor dealer, and it may be true that the maxim "*In vino veritas*," is not as applicable to the dealer as to the consumer. Some suspicion may also attach to the supplemental manner in which the statement about the will having been made for the sake of peace, was introduced into his testimony. But his credibility was also a proper question for the jury, who saw and doubtless knew him. And it would be going to an extraordinary length for this court to say that there is anything appearing in this record so necessarily impeaching either of them, that the jury were not at liberty to believe them. And, if believed, their evidence, particularly that of Mrs. Barnes, which was so near the actual execution of the will as to be a part of the *res gestæ*, was of vital significance. It showed conclusively that the will was not the will of Mr. Jackman.

But, leaving their evidence out of view, which the jury certainly were not bound, nor is this court perhaps at liberty to do, the same result follows from the testimony of Mr. Patten. True, he was an attorney in the case, and he naturally appeared with reluctance as a witness, in obedience to the decision of the other counsel that he ought to do so. But notwithstanding

this fact, against his truth or honor no suggestion has been or will be made. His testimony shows that sometime after the execution of this will, while a negotiation was pending for the purchase of a mill by *Hiram Jackman*, the contestant, and there was some hesitation about completing it on account of doubts about his ability to meet the payments, his father, on ascertaining that fact, directed the purchase to proceed, and said he would assist him in making the payments, and that if not here to do it himself, he would have it put in his will; and he then volunteered the remark : " My will never was as I wanted it."

This was a most extraordinary statement, explainable upon no other hypothesis except that of the existence of undue influence.

It is said, and truly, that the law permits the full force and effect of all those influences growing out of the affection and gratitude existing in the conjugal or any other close relationship, though used with the arts of persuasion, and even, perhaps, with a not indecent importunity. If there were nothing to warrant an inference of anything beyond this, the will should stand. But no will executed only in consequence of such influences could ever have wrung from the strong man, breaking under the weight of age and disease, an exclamation of this character. The occasion of its utterance was one that naturally called it forth. He saw his son liable to fail in a financial enterprise on account of doubts as to his ability to meet payments, not exceeding in amount the sum which he might naturally and justly have expected from his father's large fortune. It touched his paternal feelings to the quick. It presented to his mind with great power the fact that he had substantially disinherited the children of his dead wife, under an undue influence from the living; and, in answer to the self-accusation prompted by his paternal affection, and perhaps by the memories of the lost mother of

In the matter of the probate of the will of Timothy Jackman—First appeal.

his first-born children, he promised to remove the difficulty, and uttered the explanation that "his will never was as he wanted it."

This is in itself an apt phrase descriptive of the result of undue influence, for it is the precise effect of that influence to procure the formal, mechanical execution of an instrument which nevertheless was all the while contrary to the real wish and feelings of the party.

In addition to these statements of the testator himself, which, in addition to the strong presumption of undue influence arising from the nature of the transaction alone, are entirely satisfactory, I think we have also the admissions of *Mrs. Jackman,* implying with almost equal clearness the same result. The full force of her admissions will be more readily perceived if considered in connection with the facts in regard to the changes in the will. Mr. Jackman first made a will similar in all respects to the last, with the exceptions that in the first there was a proviso that in case the wife should intermarry, she should have only one-third of the property devised to her, and the remainder to be divided equally among his heirs; also a provision that the wife should pay annually to his son Jonathan one hundred dollars. Within a few weeks afterwards he directed changes in these particulars, so as to give the property to the wife absolutely, and relieve her from any obligation to pay the annuity of one hundred dollars to Jonathan. The nature of these changes is remarkably suggestive in itself. Considering the strong convictions that Mr. Jackman was shown to have entertained against making any will at all, and in favor of the just division of his estate which the law would make, and considering the fact that he had already caused the homestead to be conveyed to his wife, of the value of from $15,000 to $20,000, if, from any motives originating in his own breast, he had so far departed

from these settled convictions as to have executed the first will, it is very improbable that, after having done so, he would of his own motion have made these changes, particularly that he would have withdrawn the small annuity to his prodigal son Jonathan, for the benefit of a wife to whom he had already given over $100,000. But both of these changes were for her benefit, and they were both made.

Now, in connection with these facts, consider the statement of *Mrs. Jackman* to Mrs. Lappin. The testimony of the latter I think peculiarly important. It is characterized throughout by great discrimination and candor, and by a total absence of any inclination to color the truth in any degree against her stepmother.

In a conversation between them at about the time the will was opened, and Mrs. Lappin thinks a little before, *Mrs. Jackman* gave some explanation of these changes, and of other provisions in the will. She said she "objected" to the $100 annuity to John, and that it "would make her boys trouble to pay him $100 a year." When asked by Mrs. Lappin why she must wait four years for the $1,000 bequeathed to her, she replied that she "would need all the income for the next three or four years, and after that she would not need it all." During this or some other conversation at about that time, she said, in respect to *Hiram* "that pa left him just enough so that he could not break the will; that he would try to break it, but she did not think he could." And as if to leave no room for doubt as to the inference fairly to be drawn from such statements, that she in effect dictated the provisions of the will, she said to Mrs. Lappin, apparently in justification of a result which she seemed to feel needed justification, that she wanted to be independent of her children; that she guessed Mrs. Lappin "*would have done the same,* if in her place;" and that if Mrs. Lappin's husband were going away, she, too,

"*would look out for herself.*" If these remarks have any meaning at all, they mean that the will was as it was because she wanted it so; that she had "looked out for herself," and not that Mr. Jackman had looked out for her.

There are also a number of circumstances disclosed by the evidence, of minor importance, but tending more or less to support the same general conclusion. Among these is the fact that *Mrs. Jackman*, during the sickness of her husband, made some effort to cause him to think that *Hiram* and Mrs. Lappin did not show him sufficient attention; that she expressed suspicions that *Hiram* and his wife, when they came to visit him, came with no good intentions, but to gain his good will and to get his property. The fact of the existence of such a suspicion in her mind suggests forcibly the existence of a similar intention on her part, and that she was therefore watchful of everything endangering its success. There are also some indications of a studied design to keep him as much as possible from those influences that might induce him to change his will, and leading to a suspicion, at least, that though in health he may have previously intended to visit the east, yet in his sickness he was opposed to going, and preferred to die at home; but that, notwithstanding this, he was taken to the east, in part to cut off any opportunities for changing the will. In making this journey, from which he thought it probable he should never return, he had requested his son *Hiram* to go with him to Chicago; but that request was countermanded, evidently in obedience to the wishes of *Mrs. Jackman*.

What occurred when he gave John a new suit of clothes, and his subsequent request that when he did anything for John it should not be mentioned at the house, and his request to John to come and see him on Sundays, when his wife was gone to church, are significant circumstances, suggestive of a settled dread

of domestic scenes and influences, upon which the curtain has not been drawn.

But these, and other similar things that might be referred to, are of comparatively minor importance. The great leading grounds upon which the conclusion of undue influence is to be supported, are these:

First, the revolution in the settled testamentary and disposing purpose of the testator, for which no other cause or explanation is given.

Second, the improbability of the disposition made by the will, which is not relieved from its glaring inequality, as among the children, by the fact that the amounts directly devised to them are not greatly unequal; since, by giving the bulk of the property to the wife, the children of the first marriage are thrown entirely out of the line of inheritance.

Third, the express declarations of the testator that the will never was what he wanted it.

And lastly, the clearly implied confessions of *Mrs. Jackman*, that she herself controlled and dictated its provisions.

It is in vain to call for more direct proof of the exact manner of bringing about this result. Such proof is not to be expected. While the privacy and intimacy of the conjugal relation afford ample scope for the unseen exercise of all those gentler and sweeter influences of gratitude and affection to which the law allows full sway, it is also true that those other influences, made up of mingled importunity and complaint, so difficult either to endure or resist, are covered by the same sacred veil. It is in vain to say that there is no proof here of any violence or abusive conduct by *Mrs. Jackman* towards either him or the children of his first wife. It is not the influence of such women that is most effectual. Such conduct soon provokes a violent resistance, and results in callousness and indifference on the part of those to whom it is manifested. But it is the woman who, while

performing the general duties of a wife and mother sufficiently well to secure confidence and respect, possesses also that resolute will that pursues its purpose with a quiet but relentless persistence that is neither to be shaken off nor denied, from whom an undue influence over a man in such a condition as Mr. Jackman when this will was made, should be dreaded. Such a woman, I infer from this testimony, is *Mrs. Jackman.* I place great reliance on the testimony of *Mr. Rogers,* one of the executors, who has known her long and well, and who says of her that "if she started out to accomplish anything, I should think she would be as likely to accomplish it as anybody I ever saw." The result which she accomplished in respect to this will verifies the correctness of his judgment.

The doctrine that the free right of every man to make such testamentary disposition of his property as he chooses, should not be interfered with by courts or juries, is fully conceded. But the rule holding void a will obtained by undue influence, is entirely in harmony with that doctrine, and rests upon the most solid basis of reason and authority. It says that this free right should neither be interfered with by courts and juries, nor by anybody else. And I think the court that should, upon this evidence, hold this never to have been the will of Timothy Jackman, upon the ground that it never was what he wanted it, need be troubled by no doubts about having interfered with his free right of testamentary disposition, but might feel a reasonable degree of confidence that it had been instrumental in preventing such interference, and in carrying out the real wishes of his heart in respect to the disposition of his estate.

While, therefore, I should not think that this court had any right to set aside this verdict, merely because we might differ from the jury as to the weight of evidence, I do not deem it necessary to rely upon that

rule in this case; and even if it were proper for us to set it aside upon that ground, I should still think the judgment should be affirmed.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.